UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 21-cr-00088-DLF |
| ) | |
| NATHANIEL DEGRAVE ) | |
| ) | |
| Defendant ) | |

**DEFENDANT'S SENTENCING STATEMENT**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
Attorney for Defendant

## I.     Introduction

Comes now Defendant Nathan DeGrave by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on May 10, 2023.

Defendant DeGrave appears for sentencing before this Court having pled guilty to Counts One and Three of the Superseding Indictment filed against him, violations of 18 U.S.C. Section 1512(k), Conspiracy to Obstruct an Official Proceeding, and 18, U.S.C. 111(a), Assaulting, Resisting, or Impeding Certain Officers.

Defendant DeGrave faces a statutory maximum penalty of up to 20 years imprisonment for violating Sec. 1512(k), and up to 8 years imprisonment for violating Seç. 111(a).

## II.    Sentencing Guidelines Calculation

Defendant DeGrave and the Government stipulated in the Plea Agreement that the following provisions of the United States Sentencing Guidelines apply to the facts of this case:

Conspiracy to Obstruct an Official Proceeding (Count 1)

| | |
|---|---:|
| Base Offense Level  (U.S.S.G. § 2J1.2) | 14 |
| Causing/Threatening Injury or Damage (U.S.S.G. § 2J1.2(b)(1)(B)) | +8 |
| Substantial Interference With Justice (U.S.S.G. § 2J1.2(b)(2)) | +3 |
| Extensive Scope, Planning, or Preparation  (U.S.S.G. § 2J1.2(b)(3)(C)) | +2 |
| Obstruction - destroying evidence (U.S.S.G. § 3C1.1) | +2 |
| | **Total 29** |

<u>Assaulting, Resisting, or Impeding Certain Officers (Count 3)</u>

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2A2.2) | 14 |
| Official Victim (U.S.S.G. § 3A1.2) | +6 |
| Obstruction -- destroying documents (U.S.S.G. § 3C1.1) | +2 |
| | **Total 22** |

Because the offense level for Count 1 his higher, the remaining guideline calculations based on that Count.

| | |
|---|---:|
| Acceptance of Responsibility (U.S.S.G. 3E1.1(a) and (b)) | -3 |

<u>Combined Offense Level</u>

The parties agree that Counts 1 and 3 are grouped together into a single group under U.S.S.G. 3D1.2(c). Accordingly, the parties agree that the combined offense level for these offenses is 29.

**Total offense Level           26**

Defendant DeGrave has 0 criminal history points as determined by the United States Probation Officer, based on the detailed analysis of his criminal history set forth in the Presentence Report. As a result, Defendant DeGrave is in Criminal History Category I.

Based on a Total Offense Level of 26, with a Criminal History Category of V, the advisory Guideline Range is 63-78 months.

### III. **The Offense Conduct.**

The parties entered into an agreed upon "Statement of Offense" as part of the plea agreement. The Probation Officer has accurately set forth the relevant facts in the Presentence Report. The references below are offered only for purposes of clarification and additional context:

Par. 23: Defendant DeGrave lawfully owned a firearm in Las Vegas, Nevada. He made a decision to leave that firearm behind when he traveled to meet Sandlin and Colt in Tennessee. The firearm taken by the group from Tennessee to Washington D.C., belonged to Colt. Defendant DeGrave was unaware Colt had brought the firearm.

Due to a miscommunication, DeGrave flew from Las Vegas to Nashville to meet Sandlin and Colt. But Sandlin and Colt were waiting for him at the airport in Memphis, which is where Sandlin was staying at the time. DeGrave had flown on an overnight flight, and then waited approximately four hours at the Nashville airport for Sandlin and Colt to drive the 225 miles from one city to the other. As a result, DeGrave ended up sleeping in the back of the van for the entire drive from Memphis to Washington D.C., and did not hear or participate in any of the discussions between Sandlin and Colt during the trip. He was not aware that Colt had brought his firearm until after they group arrived in the Washington D.C. area.

Par. 24: This observation extends beyond just Par. 24 – as the Court is aware, most of the commentary on the recordings made by the Sandlin, Colt, and DeGrave came from Sandlin. He was running the camera, which belonged to him, and made the decisions about when to record himself and what he wanted to say. He then invited DeGrave and Colt to add their own comments to whatever it was that Sandlin had said.

IV. **Sentencing Factors Under Sec. 3553(a)**

Pursuant to 18 U.S.C. § 3553(a), the numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to Mr. DeGrave's background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

1. Nature and circumstances of the offense and the history and personal characteristics of the defendant.

a. The Nature and Circumstances of the Offense.

For the most part the actions of Mr. DeGrave on January 6 are not in dispute. But the context missing from a dry recitation of their actions and commentary is that much of their conduct that day was an exercise in "LARPing" – "live action role playing." Much of what the trio did was for the creation of video and audio they intended to monetize on various social media sites as well as selling the video/audio to anyone who might have wanted access to what they produced. While thousands of protesters captured various events of the day on cell phone video, co-defendant Sandlin brought to the Capitol a very expensive commercial grade video camera to record himself, Mr. Degrave and Mr. Colt.

There is no dispute that Mr. DeGrave was a supporter of former President Trump, and that he harbored an expectation that former Vice President Pence would take procedural steps to prevent Congress from certifying the election under the Twelfth Amendment and the Electoral Count Act. Mr. DeGrave traveled to Washington D.C. expecting that violence would follow the Vice President taking such action.

  b. <u>History and Personal Characteristics of Mr. DeGrave</u>.

Par 75: Mr. DeGrave returned to live in Las Vegas following his release from pretrial detention in June 2022. Mr. DeGrave was residing in Las Vegas at the time of his arrest in late January 2021. Mr. DeGrave first moved to Las Vegas in 2019, having lived with "Jack" in Boothwyn, Pennsylvania from age 18 to 27.

Nathanial DeGrave was born in Upper Darby, Pennsylvania, and grew up in Phoenixville, a suburb of Philadelphia. As a small child he lived with numerous family members, including his father, aunt, grandmother, and others. At a young age he was exposed to "partying" and similar activities by family members, and generally did not have a supportive and nurturing upbringing. His father being an alcoholic, as were many members of his extended family, requiring Nathaniel to learn to become self-sufficient at a young age. He cared for his father during his bouts of excessive drinking and witnessed his father's multiple arrests.

Nathaniel's childhood was marked by heart-wrenching moments, such as watching his father attempt suicide by hanging from a rope not knowing what to do with tears streaming down his face. Luckily, his father survived, but the vivid memory remains etched in Nathaniel's mind.

While still very young he moved from Phoenixville to Chester, Pennsylvania, where he lived together with his father, uncle, and grandparents. He resided in what he now realizes was an unsafe neighborhood, with an uncle who was a dangerous and unstable man who succumbed to alcoholism and took his own life by jumping in front of a train.

Nathaniel's parents had separated before he was old enough to remember and he had visitation with his mother every other weekend. His father raised him was his custodial parent but was a poor role model. Nathaniel lacked positive influences and role models in his extended family, which led many members of his family down similar paths of self-destruction and criminality.

Just prior to starting school he moved to the smaller suburb of Chichester and lived in an apartment complex where he developed a social circle of friends who he attended school with, something that was not possible in the more dangerous neighborhoods of Chester.

Despite his challenging upbringing, Nathaniel enjoyed much academic success throughout his school years, achieving recognition as a "honor student." His home life stabilized when his father met Terri, a woman who would later become Nathaniel's stepmother. Terri had two children of her own, which made Nathaniel part of a family unit for the first time, having a stepbrother, stepsister, and stepmother. This development had a significant positive impact on him, as he finally felt like he was part of a loving family and enjoyed spending time with his new siblings.

But this was also a period when Nathaniel began to understand how his upbringing had been different from his new family and school friends. His father's financial struggles meant that he didn't have material possessions like most of his friends. However, Nathaniel learned the value of gratitude at a young age, understanding the importance of focusing on what he had rather than what he didn't. This reality ended up serving as a source of motivation

rather than a hindrance, and Nathaniel committed himself to creating prosperity for himself and his future family.  He developed an entrepreneurial mindset that has remained with him throughout his adult life.

Amidst the turbulence of his childhood, Nathaniel found solace and inspiration in his grandparents, who would become some of the most influential role models in his life. His grandfather, a successful architect, and his grandmother, who had worked for the US embassy in Africa, had traveled the world.  Their concern for his upbringing led them to take him on a summer journey across the United States, traversed from east to west, exploring the major landmarks along the way — including stopping to see the Hoover Dam and the lights of Las Vegas.  It was a summer of discovery and opened Nathaniel's eyes to a world beyond eastern Pennsylvania, where financial stability and fulfillment were possible.

Yet, upon returning home, Nathaniel was confronted with the harsh reality that still lingered. His father's battle with alcoholism persisted, casting a shadow over the household. He recalled his father would overdose on pills, lying unresponsive on the couch as Nathaniel and his siblings cried out in anguish, desperately calling for an ambulance to save him. The cycle of alcoholism, gambling, and depression took a heavy toll on the family. Nathaniel's father and stepmother had two more children who became Nathaniel's half-siblings. Nathaniel was now the oldest among five siblings, and with his father often incapacitated, Nathaniel was in the unfamiliar role of a caretaker, looking after his younger siblings and providing a sense of stability

in their lives. At one point, his father's mental state deteriorated so severely that he was taken to a psychiatric ward.

Nathaniel's biological mother's did her best to care for Nathaniel during those trying times. He would sometimes call her, seeking comfort and solace when life at home became unbearable.

In his high school years, Nathaniel and his family moved to Linwood, Pennsylvania, where they relied on government assistance and food stamps to make ends meet.  Linwood did not offer a safer environment, and Nathaniel faced violence and bullying at school and in the neighborhood, enduring physical attacks from strangers due to his diminutive stature. These hardships, combined with the instability at home, eventually took a toll on Nathaniel's academic performance.

At the age of 17, Nathaniel dropped out of high school and set his sights on starting a company and becoming a CEO.  Nathaniel began working out at the gym to build his physical strength and confidence.  As he embarked on this journey to redefine his future, Nathaniel remained steadfast in his commitment to breaking the cycle and creating a better life for himself and his loved ones.

At the age of 18, Nathaniel embraced a new opportunity by joining a network marketing company. He spent hours cold-calling leads and successfully building a sizable downline. This first taste of success ignited a belief in his own abilities and potential, affirming that he could indeed change his life for the better. However, the company was shut down by the FDA for making unsubstantiated claims about the health products it was marketing. Though initially devastated by this setback, Nathaniel chose to see the

experience as a learning opportunity, carrying its lessons into his future endeavors.

At the age of 18 he was kicked out of his home by his father. Nathaniel found an unlikely ally in a kind-hearted man named Jack, who generously offered him a place to stay for several years. Between the ages of 19 and 21, Nathaniel worked as a sales representative for a company called Smart Circle, where he rose to the top of the company's sales team. Recognized as a leader and promoted to sales manager, Nathaniel began interviewing and training people with far more experience than he had. As he traveled the country, his family's perception of him shifted, and his younger siblings began to see him as a role model.

With just a $6 investment in a domain name, he began promoting a fitness supplement on his own website. This caught the attention of the owner of a supplement company, who made him a co-founder and gave to him the responsibility of sales and marketing of the company's products.

By the age of 23, he was earning nearly $10,000 per month in passive income. He enjoyed personal relationships with greater stability than he had known earlier in this life and had the opportunity to travel around the world both on his own and in the company of others.

In addition to his own thriving business, Nathaniel promoted a company called 1st Phorm, manufacturer of a dietary supplement popular in the health and fitness industry. His expertise in online marketing led him to create a website that ranked number one on Google for a period of time. This success

earned him the title of Most Valuable Legionnaire, an honor reserved for the top achievers in the company.

In this same time frame Nathaniel's father's health rapidly declined due to excessive alcoholism and cirrhosis of the liver.  One day in 2019, Nathaniel received a call from a family member informing him that his father was in the ICU and had not spoken for weeks. Nathaniel caught a flight the next day, only to learn that his father had passed away during his journey. After a brief visit home, Nathaniel returned to Las Vegas to continue working on his business.

But in this time frame he began living a more extravagant lifestyle, attempting to place himself in social locations where he might meet and build a network with as many successful people as possible.  He started attending music festivals and entertainment industry events in Las Vegas with a friend in law enforcement/personal security work.  That friend used his contacts to get them entry into such events.  Sometimes they created viral YouTube videos where they posed as celebrities to gain entry into such events. This led to riskier efforts to achieve bolder access to even higher profile celebrities and entertainers, all as part of an effort to increase their notoriety and find better content for their online video efforts.

Nathaniel landed a job at EDC, the largest electronic festival in the world. Backstage with various artists and celebrities he was able to capture video content for his online audience.  This growing attention eventually led him to Ronald Sandlin, a successful Las Vegas resident he admired. They had never met in person but began to communicate with each other online about their similar efforts at self-promotion and social influencing.

Seizing an opportunity to personally connect with Sandlin at the "Stop the Steal" rally in Washington D.C., Nathaniel flew to Tennessee and traveled by car with him to the January 6 STS Rally. While they exchanged views about the potential for violence on January 6, Nathaniel's purpose for attending was networking, expressing his support for former President Trump, and discussing business opportunities with Sandlin involving their common endeavors.

Nathaniel's desire for fame and recognition – which had dominated his professional and personal life after moving to Las Vegas -- led him to make decisions, including purchasing attention-grabbing outfits and making outlandish statements, which he never imagined at the time would be a meaningful backdrop for his conduct on January 6 – and this prosecution.

His reckless behavior on January 6 has now cost him almost everything he had achieved in the decade before. While his online business activities managed to survive his time in custody, they are nothing close to what he had built them into before his arrest and detention. The terms of his release pending sentencing have prevented him from doing the kind of personal marketing needed to begin to rebuild them, but he has managed to maintain them sufficient to keep them functioning.

During his time in jail, Nathaniel committed himself to personal growth and learning. He read dozens of books, learned a new language, and participated in interviews that were shared with Congress. Through deep introspection, he sought to understand the mistakes in his thinking that led to his criminal behavior, and has vowed to himself to never repeat them.

One thing he regrets about his time in detention is allowing himself to be drawn into the world of those claiming "political persecution" as a result of their actions on January 6. Nathaniel recognizes the intellectual dishonesty of admitting the criminality of his own conduct on January 6 on the one hand, and complaining about unfair treatment by the criminal justice system on the other.

But, at the same time, he maintains that his widely publicized complaints about the manner of his detention – the physical setting of the detention of other January 6 defendants in the D.C. Department of Corrections – was in violation of their constitutional rights, and that is what he spoke out against.

Since his release, Nathaniel has been steadfast in his pursuit of a positive and meaningful life. He has embraced a clean lifestyle – a departure from his pre-January 6 life -- free from drugs and alcohol, and has dedicated himself to rebuilding his professional and personal life.

As Nathaniel stands before the court, he does so with humility, a sense of responsibility, and a genuine desire to make amends. He seeks the opportunity to continue on his path of growth and to make a positive difference in the lives of others – most notably the siblings he has lost touch with because of his foolish behavior.

> 2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other <u>correctional treatment in the most effective manner</u>.

As several Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can generally be categorized as having three primary constituent parts:

1) a relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence for the purpose of disrupting the Congressional proceedings;

2) a larger number of protesters who intended to be loud and wanted to be heard, but came with no intention of engaging in violence -- although some were drawn into committing acts of violence; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.

Nathaniel DeGrave does not fit easily into any of these three groups. While dressed and talking the part of a member of the first group, the reality is that he came to D.C. on January 6 to generate video content for viral marketing purposes. This was all a function of LARPing.

Nathaniel DeGrave came to Washington D.C. not wearing "body armor", but rather wearing the type of external gear worn by off-road motorcycle enthusiasts to keep them safe from flying rocks and other debris. Co-defendant Josiah Colt described DeGrave as looking "ridiculous" in what he was wearing. Without really knowing what kind of protective equipment to buy, DeGrave bought the motorcycle gear off the internet.

But once inside the Capitol, he participated along with others in undeniably criminal conduct which gave him a false sense of achievement and bravado. Nathaniel assumed that what he and those around him had done

inside the Capitol – and particularly inside the Senate Chamber – had done was an accomplishment of the purpose for why a crowd numbering in the tens of thousands had come to the Capitol that afternoon.

His actions and comments, as reflected in the PSR, during and in the aftermath of his time inside the Senate Chamber, represented that moment of personal "achievement" that would gain for him the fame and notoriety that he had been chasing for years in Las Vegas as a presence on the internet.  It would bring to him the recognition that he equated with "success" in life, but in a context – law and politics – where he had no meaningful experience.  He never even considered the overtly illegal nature of his actions, or how they would be captured online and in the media to reflect what others saw as his criminality rather than what he saw as his accomplishment.

That realization only set in upon returning to Las Vegas and watching the media coverage of the aftermath unfold, and then hearing about the efforts by law enforcement to identify and apprehend those who were involved.

But the Government's investigation, documented extensively in the discovery, shows conclusively that the main instigator of this trio of defendants was Ronald Sandlin.  He was the common link between Colt and DeGrave, who were otherwise strangers to each other.  Both Colt and DeGrave describe their separate conversations with Sandlin in similar terms – Sandlin was a voluble communicator with a large vocabulary and kept up to date on political events surrounding the election on a daily basis. He freely shared his thoughts and beliefs with anyone who would listen – including DeGrave and Colt.

The recorded commentary, both online and in the videos produced by him demonstrate this to be true.  Further, the video evidence shows that Sandlin was the member of the group that led their actions before, during, and after after the events of January 6.

None of that exonerates Mr. DeGrave of responsibility for his conduct, and he does not seek relief from the Court on that basis.  But his words and conduct exist on a continuum, with a great deal of space between his place on that continuum and the place held by Mr. Sandlin.

      3.   <u>The Kinds of Sentences Available.</u>

Because the agreed upon guideline range is in Zone D of the Sentencing Table, the minimum term of imprisonment must be satisfied by a term of imprisonment.

      4.   <u>Any pertinent policy statement</u>.

Defendant DeGrave is not aware of any pertinent policy statement that applies to his case.

      5.   The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty <u>of similar conduct</u>.

Co-Defendant Ronald Sandlin was sentenced by this Court to a term of imprisonment of 63 months, followed by 36 months of Supervised Release.

Co-Defendant Josiah Colt has not yet been sentenced.

The stipulated guideline range of 63 to 78 months as set forth in the plea agreement is significantly higher than typical sentences imposed in other cases where the 1512(c) offense is the most serious count of conviction.

In approximately 43 cases where violations of Sec. 1512(c) largely determined the sentencing calculations, the longest sentence imposed was 87 months -- given in both <u>United States v. Reffit</u> and <u>United States v. Robertson</u>, both of whom were convicted after a jury trial.  Both cases involved far more egregious offense conduct and relevant conduct than is involved here.

Of the 43 cases, 32 have resulted in sentences of 48 months or less – significantly below the bottom of the guideline range here.

Ten cases resulted in sentences of 24 months or less.

More than one-third – 15 cases – have resulted in sentences between 24 and 42 months.

Based thereon, a sentence between 24 and 42 months would be "typical" of cases involving conduct similar to that of Mr. DeGrave notwithstanding the agreed upon Guideline Range.   A sentence of 24 months would avoid unwarranted sentencing disparity between Mr. DeGrave and other defendants similarly situated, and recognizes Mr. Sandlin's more egregious conduct and role in their jointly undertaken criminal activity in this case.

      6.    <u>The need to provide restitution to any victims of the offense</u>.

The Plea Agreement provides for restitution in the amount of $2000.  Mr. DeGrave expects to be able to make restitution in the agreed on or around the date of his sentencing.

DEFENDANT'S SENTENCING RECOMMENDATION

Nathaniel DeGrave came to Washington D.C. on January 6 not seeking so much to influence the outcome of an election or play a meaningful role in the outcome of a political dispute, but rather seeking to create and hopefully

profit from a money-making opportunity that – at the same time – provided the potential to make him the social media and internet star that he aspired to be. That was how he viewed success and established his own identity and self-worth.

His personal and professional existence to that point in his life was about creating an image and brand for himself as validating a sense of "self-worth," and allow him to continue to live an increasingly extravagant lifestyle in Las Vegas based on additional attention and notoriety.  Defendant DeGrave – without question a supporter of former President Trump in the aftermath of the 2020 Presidential Election – nevertheless focused on the aftermath of the election as an opportunity to pursue a quest for fame, and hopefully convert that fame into a monetary reward.

But the actions he elected to take in pursuit of thereof contravened the law, which he now understands and accepts.  A sentence of 24 months is fair and just sentence that takes into account an accurate reflection of the facts as they related specifically to Mr. DeGrave and his conduct.

Date: May 4, 2023                                      Respectfully Submitted,

                                                       /s/ William L. Shipley
                                                       William L. Shipley
                                                       PO Box 745
                                                       Kailua, Hawaii 96734
                                                       Tel: (808) 228-1341
                                                       Email: 808Shipleylaw@gmail.com

                                                       *Attorney for Defendant*