**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 21-cr-88-DLF** |
| | : | |
| **NATHANIEL DEGRAVE,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Nathaniel DeGrave to 37 months' imprisonment,[1] three years of supervised release, $2,000 in restitution, a $50,000 fine,[2] and the mandatory $100 special assessment for each count of conviction.

## I.     INTRODUCTION

The defendant, Nathaniel DeGrave, together with his coconspirators, Ronald Sandlin and Josiah Colt,[3] substantially planned for and then participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020

---

[1]  Prior to his release to home incarceration following his guilty plea, DeGrave served approximately 17 months in custody.

[2]  The government reserves the right to amend its fine request at or before the sentencing hearing depending on the accounting provided by defense counsel in response to the Court's March 16, 2023 Order granting the government's motion for an accounting of funds.  *See* ECF No. 109.

[3]  This Court sentenced Sandlin to 63 months of incarceration on December 9, 2022.  Colt pleaded guilty, pursuant to a cooperation agreement, to Obstruction of an Official Proceeding in case number 21-cr-74, in July 2021.  He is due to be sentenced by this Court on May 10, 2023.

1

Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[4]

DeGrave and his co-conspirators traveled to Washington, D.C. to attend the "Stop the Steal" rally with the expectation that there would be violence.   In the days leading up to January 6, 2021, DeGrave coordinated with his co-conspirators to bring a car full of weapons and protective gear—including gas masks, guns, knives, and DeGrave's bear spray—to D.C.   DeGrave also implored his social network for recommendations on "personalized [firearms] training" from "somebody special forces or ex fbi" for what he described as a "very patriotic cause."

On January 6, after Sandlin called on others to "take the Capitol" and emphasized that "freedom is paid for with blood," DeGrave chimed in that it was "time to put an end to this once and for all."   As DeGrave and his co-conspirators approached the Capitol building itself, DeGrave recorded a video in which he stated:

> They just breached the Capitol building. That's it, bro. It's game time. We all armored up, we got a gas mask. This is what separates us true patriots from everyone else who is all talk—you know, fuck this, fuck that, sitting at home, we out here taking action. It's Dr. Death in the building and it's about to go down.

After expressing this violent rhetoric, he acted on it.   DeGrave participated the mob's charge against officers at two separate choke points—the Rotunda doors and the Senate Gallery—leading to the violent breach of those spaces and risking further injury to officers and members of Congress and their staff.   He directly assaulted at least two U.S. Capitol Police ("USCP")

---

[4] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.   That amount reflects, in part, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

officers—notably, after pulling down his face mask to shield his identity—and abetted the assaults of four others.   DeGrave later bragged to Colt, "I punched this guy, like, five times," adding, "he didn't see my face though."   After breaching the Senate Chamber, DeGrave shouted down at Colt and others on the Senate floor to open the doors on that level as well as "take laptops, paperwork, take everything, all that shit."

After the riot, DeGrave attempted to capitalize on his crime by selling his co-conspirators' footage of the riot to media outlets.   He has even profited off of his unlawful conduct on January 6 since being incarcerated—to the tune of *over $120,000*—by seeking donations on crowd-funding websites claiming that he is a "political prisoner" of a "corrupt Biden regime."

After retaining new counsel in July 2021, however, DeGrave agreed to cooperate with the government in the Capitol riot investigation.[5]   He proffered with the government on six separate occasions and provided the government with helpful, actionable information, as described in a separate sealed pleading.   The government also credits DeGrave's cooperation with helping secure the guilty plea of his co-defendant Ronald Sandlin.

The reality of this case is thus two-fold.   On one hand, DeGrave engaged in menacing, violent conduct that threatened and disrupted the peaceful transition of power at the heart of our democracy, conduct befitting a serious sentence as anticipated by law and the Sentencing Guidelines.   On the other hand, DeGrave actively and publicly cooperated in a high-profile investigation garnering national attention, putting his safety on the line in the process.   Although the government credits the remorse DeGrave has expressed in his debriefs, his conduct while

---

[5] The government has detailed the extent of his cooperation in a separate sealed motion for departure pursuant to 18 U.S.C. § 3553(e) and Section 5K1.1 of the United States Sentencing Guidelines.

actively cooperating gives pause.   These concerns animate the government's requested sentence.

For these reasons, the government believes that a sentence of 37 months' imprisonment is warranted.   In addition, to preserve the central tenet that a criminal defendant should not profit from his crime, the government recommends that the Court impose at least a $50,000 fine to account for his prolific fundraising unrelated to and beyond any legitimate legal defense expenses.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense ("SOO") filed in this case, ECF No. 75, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the 2020 presidential election.

### B.    DeGrave's Role in the January 6, 2021 Attack on the Capitol

#### i.   *Planning and Coordination Pre-January 6*

In the weeks leading up to January 6, 2021, DeGrave used his social media presence to spread the type of false information and violent rhetoric that led thousands to descend on the U.S. Capitol and ultimately participate in a riot.   On Facebook, DeGrave posted that he believed the 2020 presidential election was stolen, and that he traveled to Washington, D.C. prepared to commit acts of violence to interfere with the peaceful transition of power and stop the Congressional certification of the 2020 presidential election.

Specifically, in advance of the "Stop the Steal" rally on January 6, DeGrave posted that media reports stating that Joe Biden had won the election were "fake news."   He described media outlets such as "cnn, ny times, abc, fox, associated press" as "the fakers of the fake."   When an

4

individual confronted DeGrave asking whether the media outlets were "all lying when they say Joe Biden won the election," he responded, "Correct."   In the same conversation, he told the individual that "[w]hen Trump wins they will say he 'stole the election'" and that "[t]his is all going according to plan. You will see."   DeGrave later started posting the hashtag "#neverconcede."

On December 23, 2020, co-defendant Sandlin recruited like-minded individuals in his Facebook network to join him at the rally in D.C. on January 6 to "stand behind Trump when he decides to cross the rubicon."[6]   DeGrave responded to the call, telling Sandlin that he was "considering" joining him and could "come to Nashville and drive there with you."   *See* SOO ¶ 9.   In a Facebook post on December 31, 2020, Sandlin announced his plans with DeGrave and Colt to travel to D.C. on January 6, seeking crowd-sourced funds to shoot a "mini documentary" while in D.C.   SOO ¶ 12.   In response to this post, DeGrave wrote, "[i]t's time the American people rise and stand up for this country. We're tired of the corruption."   *Id.*

DeGrave's Facebook search warrant return reflected coordination and planning for violence in D.C. on January 6.   In one December 30, 2020 conversation, Sandlin wrote DeGrave, "Yo sorry bro I'm going back and fourth [sic] about going some people I respect are saying it may get dangerous" and then, "Are you down for danger bro?"   DeGrave responded, "Im bringing bullet proof clothing" and "yes."   SOO ¶ 10.   The next day, on December 31, 2020, DeGrave posted on Facebook asking: "Who can shoot and has excellent aim and can teach me today or

---

[6] This phrase is a reference to Julius Caesar's crossing the Rubicon river and signifies committing oneself "irrevocably to a risky or revolutionary course of action, similar to the modern phrase 'passing the point of no return.'"   *See* https://www.collinsdictionary.com/dictionary/english/to-cross-the-rubicon.

tomorrow." SOO ¶ 11. In response to other users' comments to this post, he wrote "I want somebody special forces or ex fbi to teach me"; "I want personalized training from the best"; and "I'm open to learning all the essential skills. Whatever is necessary to survive." *Id.* When a user recommended a particular person for the task and advised "he's not cheap," DeGrave responded that "this is for a very patriotic cause." *Id.*

Beginning on December 31, 2020, DeGrave, Sandlin and Colt began a private group chat on Facebook to plan for the 6th. They discussed "shipping guns" to Sandlin's residence in Tennessee, where they would all meet before driving to D.C. Colt said he would try to fly with his "G43," referring to his Glock .43 caliber pistol. They filled up their Amazon shopping carts with weapons and paramilitary gear to take to the Capitol. Sandlin later stated he was bringing his "little pocket gun" and a knife. Later that evening, DeGrave asked for Sandlin's address, which Sandlin provided, and then wrote that he had "about 300 worth of stuff coming to you." Sandlin and Colt later posted pictures of their recent purchases, including a Glock holster, gas masks, shin guards, and a helmet. SOO ¶ 13.

On January 4, 2021, DeGrave wrote Sandlin and Colt, "[w]e meet here at 10:00 a.m." and sent a screenshot of "wildprotest.com" depicting a map of the U.S. Capitol with a "Meet Here" notation in front of the building. SOO ¶ 15. He also forwarded them a post from the Parler application stating: "#DoNotCertify #january6th" and "#stopthestealcaravan #darktolight #thegreatawakening #DRAINTHESWAMP," followed by his own commentary, "let em try us." *Id.*

DeGrave, Sandlin, and Colt (hereinafter, the "trio") ultimately brought the following weapons and other items with them in a rental car from Tennessee to the D.C. metropolitan area

6

on January 5, 2021: Colt's Glock 43 pistol, Sandlin's M&P bodyguard pocket pistol, two magazines of ammunition, two cans of bear mace (one purchased by DeGrave), gas masks, a handheld taser/stun gun, a slingshot, military-style vests/body armor, two helmets, an expandable baton, walkie talkies, and several knives.   *See* SOO ¶ 17.

When they arrived in the D.C. area on January 5, the trio picked up a fourth individual—a female—from Reagan National Airport, and the four went to a rally protesting the results of the 2020 presidential election in Washington, D.C. that evening.   While driving back from the rally, a can of bear spray discharged in DeGrave's pocket.   Colt posted a video of this moment to his social media bearing the caption, "Nate's bear mace was going off in his pocket and it started filling the van [with] bear spray."   SOO ¶ 19.

> ii.     *Events of January 6*

DeGrave and his co-conspirators traveled to D.C. early in the morning on January 6 to attend the "Stop the Steal" rally.   As they prepared for the rally in their hotel room, Colt recorded a selfie-style video in which the trio and the female friend appear.   Colt discussed a "debate we've been having for days now: should we carry our guns or not?"   SOO ¶ 20.   DeGrave responded, "for the camera's sake, we're not going to carry."   *Id.*

DeGrave ultimately carried a can of bear spray in his pocket and a walkie talkie, while Sandlin armed himself with a knife.   *See* Figure 1 (depicting bear spray in DeGrave's pocket, as seen in video recorded by Colt); SOO ¶ 24.   All three wore protective gear, including face/gas masks and shin guards.



*Figure 1*

Before the riot began, the trio traveled from the rally to a TGI Friday's restaurant in Alexandria, Virginia, where they watched former President Trump's speech on television.   After the speech ended, Sandlin live streamed a "selfie"-style video while sitting across the table from DeGrave and Colt.   In the video, Sandlin said, no less than four times, "freedom is paid for with blood."   *See* Ex. 1.[7]   Sandlin also stated:

> Alright so we have been at the protests...we were there pretty early, scoped it out...there were some scrimmages, I will upload the video later...I think a precursor of what is going to [happen] in a few hours.   People are really mad...it is just a precursor to what's going to happen...Either way there is going to be violence.

A little later in the video, Sandlin stated:

> What is happening to this country is absolutely horrific, absolutely horrific...we are ready to occupy the state capitol if needed to...*I urge other patriots watching this too, to be willing to take the capitol...if you are watching this and you are a patriot and are here,*

---

[7] All video exhibits cited will be provided to the Court via a file sharing platform.

> _I think it is time to take the capitol and I don't say that lightly_…. I am willing to do it, I willing to go and fight for this country.   Even if that means I have to sacrifice in some capacity.   It is not what I want to do…

(Emphasis added).

In the video, Sandlin handed the recording device to Colt and DeGrave.   Colt stated that "[t]he whole thing is a scam, dude.   The whole election, they can't just steal an election.   Like they are trying to do in Georgia last night.   It is a lie."   DeGrave responded: "We are sick and tired of the fucking lies.   It is time to put an end to this once and for all."   _Id._ (from 6:45-7:30 mark).   At this point, Sandlin took the device back from them and stated: "You either have conviction and you stand up for what you believe in or you sit down and shut the fuck up."   Towards the end of the video, Sandlin stated:

> _If we need to occupy the Capitol, we will occupy the Capitol._   You guys are driving all the way to D.C. and you are missing the rally. We have been at the rally, we went last night, we have been at the rally since six in the morning.   We needed to grab a bite to eat, and like decompress because we went through a few intense moments and also regroup and plan for the next….._one o'clock is when it is all going to go down.   So we are going to be there back by one o'clock when it is action time it is game time._

(Emphasis added).

At this point in the video, Colt asked Sandlin, "storming the Capitol?" to which Sandlin replied, "I'm willing to occupy the Capitol."   _Id._ (from 9:25-10:10).   Sandlin's statements appear to refer to the joint session of Congress at the U.S. Capitol building that began at approximately 1:00 p.m.   The trio agreed to go to the Capitol shortly after this video was made.   SOO ¶ 23.

Videos posted to Colt's social media as well as videos recovered from the trio's devices show them walking on the National Mall towards the Capitol.   In one such video, DeGrave

appeared to tell someone on a walkie talkie, "meet us there, over." Ex. 2 (recovered from Sandlin's laptop, entirety). DeGrave then stated, "they're trying to get through the barricade, they're going in," to which Sandlin responded, "It's go time. Pence did his job, it's time for us patriots to do our job. We need to occupy the Capitol building." *Id.*; *see* SOO ¶ 25.

Upon arriving on Capitol grounds, the trio learned that rioters had, in fact, breached the barricades and were storming the Capitol. They scaled a dismantled bike barricade to get over a stone barrier and moved closer to the Capitol building. *See* Ex. 3 (recovered from DeGrave's cell phone, entirety). Around this time, DeGrave recorded a video on his cell phone, stating: "They just breached the Capitol building. That's it, bro. It's game time. We all armored up, we got a gas mask. This is what separates us true patriots from everyone else who is all talk—you know, fuck this, fuck that, sitting at home, we out here taking action. It's Dr. Death in the building and it's about to go down." Ex. 4 (video recovered from Trash folder on DeGrave's cell phone, entirety); SOO ¶ 27.

The trio then wormed its way through the crowd, pushing past others to get closer to the Capitol building. As they did so, Sandlin repeatedly yelled things such as "we're not here to spectate anymore," "the time for talk is over," and "if you're not breaching the building, move out of the way." *See* Ex. 5 (video from Colt's GoPro camera, from beginning to 1:12 mark). DeGrave witnessed rioters climbing the scaffolding set up for the presidential inauguration. *See id.* As he ascended the stairs next to the scaffolding, DeGrave heard someone say that there was "pepper spray inside the building, masks up." *See id.* (from 7:15-7:40 mark); SOO ¶ 29. Once

10

on the Northwest Terrace of the Capitol, Colt asked DeGrave if he was "ready," to which DeGrave responded, "we're fucking angry" and "we're not the silent majority no more."   *Id.*

Undeterred by the mayhem and obvious signs of a violent breach of the U.S. Capitol building, the trio stormed the Capitol through the Upper West Terrace doors at 2:35 p.m., just as Sandlin had suggested at the TGI Friday's hours earlier.   *See* Ex. 5.   The trio made their way through the Rotunda to the East Rotunda doors, on the other side of which a mob was attempting to gain entry to the Capitol.   As he entered this space, DeGrave observed three USCP officers standing guard in front of these doors, with twenty to thirty other individuals encircling them. With the security alarm blaring, Sandlin approached the officers, yelling to "get out of the way" and "your life is not worth it today."   *See* Ex. 6 (recovered from Sandlin's laptop, from 0:15-0:35); Ex. 7 (CCTV footage, from 23:00-24:15).

Immediately thereafter, the mob, including DeGrave and Sandlin, began shoving the officers to force the door behind them open, allowing the mob outside to begin streaming in. During this melee, DeGrave shouted, "get the fuck through" and "kick it the fuck open," while Sandlin tried to rip the helmet off of USCP Officer B.A.   *See* SOO ¶ 32; *see also* Ex. 7 (CCTV footage, from 23:00-24:15), Ex. 8 (recovered from DeGrave's cell phone, entirety).   Officer A.W. was "pinned and crushed" during this assault, while Officer K.T. was pepper sprayed by rioters, rendering him momentarily blind and forcing him to feel along the wall to make it to safety.   *See* Ex. 9 (Colt's GoPro footage of assaults, from 1:40-2:30); Exs. 10-11 (reports of interviews with Officers A.W. and K.T.).

After enabling the breach of a key entry point to the Capitol, the trio ascended a set of stairs in search of the "Senate…where they're meeting."   *See* Ex. 9 (from 3:35-4:05).   The trio

11

eventually made their way to a hallway just outside the Senate Gallery, a balcony overlooking the Senate Chamber.   Only twenty minutes earlier, the U.S. Senators gathered there to certify the Electoral College vote had been evacuated.   As the trio entered the hallway, three USCP Officers were locking the doors to the Gallery to prevent the rioters from gaining access.

Sandlin led the charge, shouting at these officers, "don't you lock another door," and then at fellow rioters to "grab the door."   *See* Ex. 6 (from 4:35-5:00).   DeGrave then joined Sandlin and other rioters in a shoving match with the officers in an attempt to keep the doors to the Senate Gallery open.   Before he joined the fray, DeGrave pulled down his mask to hide his face, later bragging to Colt that he "punched this guy, like, five times…but he didn't see my face."   SOO ¶¶ 35-36; *see* Figure 2 and Exs. 6, 9 (from 7:00-7:45).   It does not appear DeGrave "punched" any of the officers during this scrum, though he did lay his hands directly on Officer N.T.—the victim underlying the § 111(a) count (Count Three) to which DeGrave pleaded guilty—during the shoving match.



*Figure 2 (DeGrave shoving USCP officers near Senate Gallery doors)*

Having violently breached yet another sensitive space, the trio entered the Senate Gallery. As Colt prepared to climb down to the Senate Chamber, DeGrave told his fellow rioters that Colt was "going down" and "opening the doors."   SOO ¶ 37.   He then took Colt's GoPro camera and kept recording as Colt dangled from the balcony and jumped down to the Senate Floor.   DeGrave cheered as Colt ran to the chair reserved for the Senate President (i.e., the Vice President of the United States), stating "sit in Pelosi's seat, that's your fucking seat now."   He also instructed Colt to "open the door" to an antechamber off the Senate Floor and to "keep it open."   *Id.*; Ex. 9 (from 10:14-end); Ex. 12 (GoPro footage from inside Senate Chamber, from beginning to 0:15).

Colt followed these instructions, jumping down to the Senate Floor and sitting in the seat occupied moments earlier by the Vice President.   DeGrave shouted, "we need everybody in here now," before telling Colt and others on the Senate Floor to "take laptops, paperwork, take everything, all that shit."   SOO ¶ 38; Ex. 12 (from 1:25-2:00).   He then exited the Senate Chamber and descended a set of stairs.

DeGrave exited from the east side of the Capitol at approximately 2:51 p.m., while holding his arms up triumphantly and shouting, "we fucking did it" and "our fucking house now."   *See* SOO ¶ 40; Ex. 12 (from 4:05-4:50).   As the two walked away from Capitol, the still-recording GoPro camera captured DeGrave stating, "we're the heroes of this whole fucking thing."   SOO ¶ 40.   He added, "in two hours … we're gonna hear a decision…they won't reject it if they know what's good for them."   DeGrave later stated to an unknown individual, "we worked as a team, we were the ones that infiltrated."   *Id.*

         *iii.*      *Post-Riot Activities and Destruction of Evidence*

After leaving Capitol grounds, DeGrave and Colt attempted to reunite with Sandlin, texting him through their Facebook group chat.   On January 6 at 3:20 p.m.,[8] Sandlin advised them that he "got sprayed … bad."   *See* Ex. 13 (the trio's Facebook group chat).   DeGrave provided his phone number, which Colt's friend in the group chat said he would call.   Colt's friend further advised that "Guard coming in and va swat"[9] and that he would "work on finding help," to which DeGrave responded, "[t]hank you bro we need it."   *Id.*   Later that evening, around 5 p.m., DeGrave told Sandlin to "untag and delete all posts."   *Id.*; SOO ¶ 41.   DeGrave similarly deleted various messages, photographs, and videos documenting his time in the Capitol from his cell phone and social media, including several videos (e.g., Exhibits 3, 4, and 8) later recovered by the FBI from the "Trash" folder on his phone.   *See* SOO ¶ 41.

After briefly reuniting at their hotel, the trio left D.C. and began to drive cross country. DeGrave separated from Sandlin and Colt in Tennessee, where he took his scheduled flight back to Las Vegas.   At approximately 7 p.m. on January 6, DeGrave sent a YouTube link of a BBC News clip entitled "Chaos in Washington as Trump supporters storm Capitol and force lockdown of Congress."   Ex. 13.   He then left the group chat.   *See id.*

         *iv.*      *Post-Arrest Statements*

On January 28, 2021, the FBI arrested Sandlin and DeGrave in Las Vegas after witnessing Sandlin leave DeGrave's residence.   Following his arrest, DeGrave waived his Miranda rights and

---

[8]  Facebook returns show time stamps in UTC, or Universal Time Coordinated, which is five hours ahead of Eastern (Daylight) Time during winter months.   *See* https://www.onlineconverter.com/utc-to-est.

[9] The government understands that this refers to the National Guard and SWAT teams from Virginia.

proceeded to lie to the FBI.   Specifically, DeGrave stated "I was not inside the Capitol" the day

of the riot.   He denied being captured on security camera footage alongside Sandlin and Colt

inside the Capitol, stating that "that's completely shocking to me. I though the only reason I was

here is because I was letting Ronny stay with me."

*v.*     *Attempts to Profit Off Criminal Conduct*

Prior  to  their  arrests  and  despite  knowing  they  were  likely  targets  of  a  criminal

investigation, DeGrave, Sandlin, and Colt discussed selling their footage of the riot via encrypted

messaging applications.   *See* SOO ¶ 41.   On January 9 and 10, 2021, DeGrave privately

messaged with a third party about providing footage to produce a documentary.   He told the third

party to download and call him on wickr, and that it was "going to absolutely blow your mind what

I will tell you."   DeGrave later stated that he would have to "talk my boy into it," "go to Idaho to

get [the footage],"[10] and that it was "with his attorney."

Even after his arrest, DeGrave attempted to profit off his unlawful conduct on January 6.

He created several online fundraisers on the GiveSendGo ("GSG") website, claiming he was a

"political prisoner" in "America's Gitmo"—referring to the D.C. jail.   *See* Government

Objections to Draft Pre-Sentence Investigation Report ("PSR"), ECF No. 105 and attachments

(GSG accounts pertaining to DeGrave screen captured by the government on September 28, 2021,

January 5, 2022, and June 16, 2022, respectively).[11]   One of DeGrave's GSG campaign

description stated that he was subject to a "weaponized, two-tiered justice system" that was "biased

---

[10]  The government understands DeGrave was referring to Colt, who lives in Idaho, and the GoPro
footage in his possession.
[11]  Notably, all of these fundraising campaign accounts were identified after DeGrave had retained
his new counsel and was seeking to cooperate.

and discriminatory," while another stated that "Nathan's only crime is his non-violent participation at the mostly peaceful January 6 rally.   The corrupt Biden regime has made it clear that if you are a conservative or republican, they will throw you in America's Gitmo."   *See id.*   In total, DeGrave has raised over $120,000 on these platforms.

### III.    THE CHARGES AND GUILTY PLEA

On September 15, 2021, a federal grand jury returned a superseding indictment charging DeGrave with Conspiracy to Obstruct an Official Proceeding in violation of 18 U.S.C. § 1512(k), Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), and Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2).

On June 27, 2022, DeGrave pleaded guilty to Count One, Conspiracy to Obstruct an Official Proceeding, and Count Three, Assaulting, Resisting, or Impeding Certain Officers— specifically, Officer N.T., pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

DeGrave now faces sentencing on Conspiracy to Obstruct an Official Proceeding in violation of 18 U.S.C. § 1512(k)(2) and Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1).   As noted by the plea agreement and the Probation Office, DeGrave faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count One and up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Three.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).

In this case, the applicable Guidelines range is not in dispute.   The parties and Probation also agree that the below Guidelines apply:

Count One: 18 U.S.C. § 1512(k)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[12] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation[13] | +2 |
| U.S.S.G. § 3C1.1 | Obstructing/Impeding Administration of Justice[14] | +2 |

---

[12] This Court previously applied this Guideline to a January 6 defendant in part because his "failure to stand down and follow the lawful command of the officers was threatening to them."   *United States v. Reffitt*, 21-cr-32, Sentencing Tr. 38:11-18.   Here, the parties and Probation have agreed that this Guideline applies because DeGrave's conduct was clearly threatening.   He joined in two separate mob assaults on USCP officers, laying his hands directly on at least two officers.   After assaulting USCP officers who were attempting to lock the doors to the Senate Chamber, forcing them to retreat, DeGrave followed them with his fists closed in a boxing stance.   DeGrave's active attempts to interfere with the officers' lawful duties and threatening gestures as the officers retreated certainly "involved …threatening to cause physical injury to a person…in order to obstruct the administration of justice" in the context of the riot at the Capitol during the Electoral College vote certification.   U.S.S.G. § 2J1.2(b)(1)(B).

[13] This Court has previously found that co-defendant Sandlin engaged in "substantial planning" for the events of January 6, 2021.   Apr. 13, 2021, Detention Hr'g Tr. 20:22-22:7.   DeGrave participated in much of the same conduct supporting that finding, including amassing weapons and protective gear to interfere with the peaceful transition of power in D.C. on January 6.   Judge Friedman, who presided over DeGrave's detention proceedings, similarly concluded that DeGrave engaged in "extensive planning" and "expected not only to encounter violence on January 6 but to perpetrate it."   *See United States v. DeGrave*, 21-cr-90 (PLF), ECF No. 44, at 22-24.

[14] The parties and Probation agree that this Guideline applies because DeGrave deleted photographs and videos depicting the events at the Capitol on January 6, 2021, and encouraged others to do so as well.   *See* PSR ¶¶ 42, 55.   Deleting this evidence triggers U.S.S.G. § 3C1.1 n. 4(D), which instructs that the enhancement applies where there is evidence of "destroying or concealing … evidence that is material to an official investigation or judicial proceeding (*e.g.*,

17

**Total      29**

*See* Plea Agreement at ¶ 4(A); PSR ¶¶ 49-59.   The draft PSR further concludes that Counts One and Three group under the Guidelines because the conduct of Count Three is treated as a specific offense characteristic in Count One.[15]   *See* PSR ¶¶ 44-48.   The parties agree.   *See* PSR ¶ 8.

The U.S. Probation Office calculated DeGrave's criminal history as category I, which is not disputed.   PSR ¶ 63.   Accordingly, DeGrave's Combined Offense Level is 29, and his Total Adjusted Offense Level after acceptance of responsibility is 26, resulting in a Guidelines imprisonment range of 63 to 78 months.

As noted in the separate sealed motion for departure from the Guidelines, the government seeks a departure from the applicable Guidelines range—specifically, a five-level downward departure, representing a Total Adjusted Offense Level of 21 and a corresponding Guidelines range of 37 to 46 months.   In light of DeGrave's substantial assistance, the government believes a sentence of 37 months' incarceration is appropriate in this case.

---

shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence)."

[15] The draft PSR does not include a Guidelines analysis for the two Counts—Counts One and Three—to which the defendant pleaded guilty.  *See* PSR ¶¶ 44-59.  U.S.S.G. §§ 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count."   Only after the Guidelines analysis (as set out in U.S.S.G. § 1B1.1(a)(1)-(3)) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.   The draft PSR does not follow these steps.   It concludes (*see* PSR ¶ 46) that Counts One and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  In a vacuum, as discussed

below, these factors certainly merit a Guidelines sentence.  As discussed in the government's

sealed motion, however, the substantial assistance DeGrave provided to the government warrants

a lower sentence.   We also seek a fine for the reasons detailed below.

A.  Nature and Circumstances of the Offense

As outlined in Section II.B of this memorandum, DeGrave's felonious conduct on January

6, 2021 was part of a massive riot that almost succeeded in preventing the Electoral College

certification vote from being carried out, frustrating the peaceful transition of presidential power,

and throwing the United States into a constitutional crisis.   The nature and circumstances of

DeGrave's offenses were of the utmost seriousness and fully support the government's

recommended sentence.

B.  DeGrave's History and Characteristics

DeGrave does not have a notable criminal history, resulting in a criminal history score of

zero. [16]   Although he appears to have complied with his conditions of release and home

incarceration for nearly a year, DeGrave incurred two GPS monitoring violations a little over a

week ago.   According to his Pretrial Services Officer, on the day DeGrave's location monitoring

bracelet was determined to have connectivity issues, DeGrave took the opportunity to go to a pool

and gym with a female companion, in violation of his home incarceration condition.   *See* Dkt. No.

111 (showing photos, presumably from DeGrave's phone as captured by Pretrial's device

---

[16] DeGrave was convicted of misdemeanor Drunkenness Offenses in Delaware in 2009 and
Careless Driving in Pennsylvania in 2017.   PSR ¶¶ 62-63.   It is unclear whether he was
sentenced to any term of incarceration for these offenses.

monitoring software, of DeGrave in said locations on that date).   He appears to have gone to the pool again two days later, on April 24, 2023, in violation of his release conditions.   *See id.*

The government is also concerned regarding the depth of DeGrave's recognition of the gravity of his conduct on January 6 and, relatedly, the sincerity of his remorse.   Until very recently and despite actively assisting the government, DeGrave was fundraising based on the idea that he was a "political prisoner" and minimizing his conduct and that of other rioters that day.   *See* ECF No. 105 and attachments.   Claiming political prisoner status and continuing to profit from his illegal conduct is of course antithetical to remorse and acceptance of responsibility.

Similarly, on October 17, 2021—again, while assisting the government—DeGrave gave an interview to Las Vegas media outlet I-Team News while detained at the D.C. jail.[17]   Notably, despite hearing the government's ample evidence during his detention proceedings, DeGrave told the reporter that there was "no evidence of him pushing any law enforcement officer," and that "his actions show he was shooting a documentary."   He added that he "knew that things were going to happen inside the Capitol. We followed the crowd inside hoping to get that all on film." Seemingly in line with his "vision of creating and running the 'Patriot Palace' in Las Vegas, starting a news media channel, and making conservative, right-wing news attractive to the new generation," DeGrave also told the reporter he was considering running for mayor of Las Vegas

---

[17]  *See* David Charns, *I-Team Exclusive: "We're Not Domestic Terrorists," Accused Capitol Rioter Says He's Thinking of Running for Mayor*, 8 NEWS NOW (Oct. 17, 2021), *available at* https://www.8newsnow.com/investigators/i-team-were-not-domestic-terrorists-accused-las-vegas-capitol-rioter-says-he-plans-to-run-for-mayor-nate-degrave-jan-6/?ipid=promo-link-block1.

during the next election cycle. *See* ECF No. 105. These statements give pause as to whether DeGrave has fully internalized the wrongfulness of his conduct on January 6.

Indeed, as noted in the I-Team News interview and as he surely will claim in his sentencing submission, DeGrave seems to have adopted the view that his forcible breach of the Capitol was animated by his desire to shoot a documentary, as opposed to his political rhetoric and hostility towards elected officials. While defendants often have dual purposes underlying their criminal conduct, attempting to diminish his culpability by claiming some sort of First Amendment justification for his actions is, again, contrary to his sworn statements at the plea hearing and in his Statement of Offense as well as the notion of true remorse. *See* SOO ¶¶ 8, 37-38, 40, 44-45 (admitting that he stated he and his co-conspirators were "heroes" for storming the Capitol, that he intended to stop or delay the congressional proceedings, and that he told Colt members of Congress will not certify the election results "if they know what's good for them").

Nevertheless, as described in this memorandum and its sealed supplement, we acknowledge the defendant's cooperation.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. DeGrave's criminal conduct—i.e., planning for and conducting an assault on the Capitol in order to disrupt and delay the Electoral College count—was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[18]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

As alluded to above, the government has significant concerns regarding whether DeGrave has been sufficiently deterred from future criminal conduct based on his statements minimizing his role on January 6 and his extensive and recent efforts to profit from his part in the riot at the Capitol.   Moreover, his recent violations of his release conditions—apparently when he believed his GPS monitor was offline and he could get away it it—suggest that DeGrave is still amenable to defying authority when it suits him.   The government thus believes that specific deterrence in the form of an additional period of incarceration is necessary for this defendant and supported by the 3553(a) factors.

### E.  Unwarranted Sentencing Disparities[19]

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

---

[18]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

[19]  A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.   To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."   The table shows that imposition of the government's

guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."    *Gall v. United States*, 552 U.S. 38, 54 (2007).    In short, "the Sentencing Guidelines are themselves an anti-disparity formula."    *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).    The "open-ended" nature of the Section 3553(a) factors, however, means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."    *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).    "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."    *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

To be sure, DeGrave's conduct is quite similar to that of his co-defendant Ronald Sandlin, whom this Court sentenced to a Guidelines sentence of 63 months' incarceration.    But putting aside DeGrave's cooperation, there are significant differences between Sandlin's and DeGrave's conduct.    For one, DeGrave was not the leader of his small group of co-conspirators—that was Sandlin.    Sandlin was the one who recruited DeGrave, Colt, and others to go to D.C. on January 6, 2021, to "stop the steal."    Sandlin and Colt each brought a firearm to D.C., while DeGrave's most serious contribution to the trio's cache of weapons was a can of bear spray.    And Sandlin

---

recommended sentence in this case would not result in an unwarranted sentencing disparity.

came up with the idea to "occupy" and "take the Capitol" long before any rioter had breached the building and led the charge as the trio marched toward the Capitol. Although DeGrave, like Sandlin, assaulted numerous USCP officers while trying to facilitate their fellow rioters' breach of sensitive spaces, Sandlin clearly was the ringleader and thus more culpable.

More importantly, DeGrave immediately sought to cooperate once he retained his current counsel and, as discussed in the accompanying sealed motion, has provided substantial assistance over numerous meetings with the government. These facts clearly distinguish DeGrave from Sandlin and warrant the proposed departure.

While valuing a defendant's cooperation is not an exact science and differs by jurisdiction, given the substance of DeGrave's cooperation, the government believes the recommended sentence would not result in unwarranted disparities.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[20]   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with

---

[20] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."   *See* 18 U.S.C. § 3663(a)(3).   *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The victim in this case, Officer N.T., did not suffer bodily injury as a result of DeGrave's assault.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that DeGrave must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role he played in the riot on January 6.[21]   PSR ¶ 41.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in October 2022.   *Id.*   DeGrave's restitution payment must be made to the Department of Treasury, which will forward the payment to the Architect of the Capitol.   *See* PSR ¶ 104.

## VIII.   FINE

DeGrave's convictions under Sections 111 and 1512 subject him to a statutory maximum fine of $250,000.   *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or

---

[21] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

Subject to what the defense accounting of funds ordered by the Court shows, a fine of $50,000 is appropriate in this case. *See* ECF No. 109.  On multiple occasions during these proceedings, including as recently as June 2022 (shortly before his plea hearing), DeGrave has sought to profit from his illegal conduct at the Capitol by selling the trio's footage of the riot or fundraising based on his claimed political persecution by the Department of Justice.   It is of course a basic premise that a criminal defendant should not profit from violating the law.   Indeed, this Court in *Sandlin* as well as other judges in this district have levied fines in January 6 cases where the circumstances warranted it.  *See, e.g.*, *United States v. Sandlin*, 21-cr-88-DLF (imposing $20,000 fine where defendant raised substantial funds but benefitted from court-appointed attorney); *United States v. Williams*, 21-cr-377-BAH (imposing $5,000 fine on § 1512(c)(2) conviction); *United States v. Gold*, 21-cr-85-CRC (imposing $9,500 fine where defendant used court-appointed attorneys but did not pay them after raising substantial funds for purported legal defense); *cf. United States v. Fairlamb*, 21-cr-120-RCL (did not impose fine, as requested by government, after finding defendant did not have ability to pay, given that he had lost his business—a gym—and was at risk of losing his house).

Incredibly, DeGrave has raised *over $120,000* in GiveSendGo fundraising campaigns premised on his alleged status as "Beijing Biden's political prisoner," among other catchy titles. *See* Gov't Objections to PSR, ECF No. 105 and attachments.  He did this despite seeking to cooperate with the government and admitting he and his co-conspirators were guilty since at least November 2021.   In one campaign that raised at least $7,990, DeGrave sought funds to "push[]

Nathan's agenda of promoting and democracy that is fair by fighting election fraud" and "fulfill his vision of creating and running the 'Patriot Palace' in Las Vegas, starting a news media channel, and making conservative, right-wing news attractive to the new generation."   *See id.*

In sum, DeGrave can afford a substantial fine to reimburse taxpayers for his part in causing significant damage to the United States Capitol and placing enormous burdens on the criminal justice system, including his use of an appointed attorney from his initial detention in January 2021 until he retained his current counsel in July 2021.

## IX.    CONCLUSION

For the reasons set forth above, the government asks that the Court impose a sentence of 37 months' imprisonment, three years of supervised release, restitution in the amount of $2,000, a $50,000 fine, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:    */s/ Jessica Arco*
JESSICA ARCO
Trial Attorney-Detailee
D.C. Bar No. 1035204
601 D St., NW
Washington, D.C. 20530
jessica.arco@usdoj.gov
Telephone: 202-514-3204