1                     BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,        .
                                      .  Case Number 21-cr-88-2
4             Plaintiff,              .
                                      .
5         vs.                         .
                                      .  Washington, D.C.
6    NATHANIEL DEGRAVE,               .  May 10, 2023
                                      .  10:09 a.m.
7             Defendant.              .
     - - - - - - - - - - - - - - - - -
8

9                 PUBLIC TRANSCRIPT OF SENTENCING HEARING
                       (SEALED PORTION REDACTED)
10            BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                     UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the United States:      JESSICA ARCO, ESQ.
                                 United States Department of Justice
14                               950 Pennsylvania Avenue Northwest
                                 Washington, D.C. 20003
15

16   For the Defendant:         WILLIAM SHIPLEY, JR., ESQ.
                                 Law Offices of William L. Shipley
17                               P.O. Box 745
                                 Kailua, Hawaii 96734
18

19

20

21   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.

```
 1                      P R O C E E D I N G S

 2          (Call to order of the court.)

 3              COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4     Action 21-88-2, United States of America versus Nathaniel

 5     DeGrave.

 6          If I can have counsel please approach the podium and state

 7     your names for the record, starting with the United States.

 8              MS. ARCO:  Good morning, Your Honor.  Jessica Arco

 9     appearing on behalf of the United States.

10              THE COURT:  Good morning, Ms. Arco.

11              MR. SHIPLEY:  Good morning, Your Honor.  William

12     Shipley on behalf of defendant Nathaniel DeGrave, who is present

13     in court.

14              THE COURT:  All right.  Good morning, Mr. Shipley and

15     Mr. DeGrave.

16              THE DEFENDANT:  Good morning, Your Honor.

17              THE COURT:  All right.  So we are here for sentencing,

18     and I have reviewed the final presentence report and

19     recommendation.

20          Oh, we also have Officer Gavito.  Good morning, Officer

21     Gavito.

22              PROBATION OFFICER:  Good morning, Your Honor.

23              THE COURT:  I have also read the parties -- in

24     addition to the presentence report and recommendation, I've read

25     the parties' sentencing memoranda and exhibits, including all
```

1  the letters submitted on behalf of Mr. DeGrave.  I've reviewed

2  the exhibits multiple times in this case, the detention hearing

3  for Mr. Sandlin and for Mr. Sandlin's sentencing and now for

4  Mr. DeGrave and Mr. Colt, who I have later today.  I've also

5  read the victim statements.

6       Ms. Arco, I take it you've made the videos available and

7  will do so to the public?

8            MS. ARCO:  Absolutely, Your Honor.

9            THE COURT:  All right.  And I've reviewed the

10 government's 5K motion, the defense's response, the government's

11 request for financial accounting, and the defendant's response.

12      Ms. Arco, other than through their statements, the 302s, do

13 any of the victims seek to be heard today?

14           MS. ARCO:  No, Your Honor.

15           THE COURT:  All right.  Have I missed anything,

16 Ms. Arco, Mr. Shipley, in terms of what I should have reviewed?

17           MR. SHIPLEY:  No, Your Honor.  I think the Court has a

18 complete record for the purposes of today.

19           THE COURT:  Okay.  Do you agree, Ms. Arco?

20           MS. ARCO:  I agree, Your Honor.

21           THE COURT:  All right.  Mr. Shipley, have you reviewed

22 the final presentence report with Mr. DeGrave?

23           MR. SHIPLEY:  We have, Your Honor.

24           THE COURT:  I notice you did not provide any

25 objections.  You have listed some semi-objections but more

1    clarifications, in your words, in the sentencing memorandum.

2        But am I correct that the presentence report is factually

3    accurate and there are no legal objections to the guideline

4    calculations?

5            MR. SHIPLEY:  Correct.  I think it fairly captures the

6    factual basis for the offense, and the guideline calculations

7    were agreed upon between the parties in the plea agreement and

8    accurately reflects those as well.

9            THE COURT:  Okay.  Mr. DeGrave, did you carefully

10   review and read the PSR and discuss it with your attorney?

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  Did you have enough time to correct any

13   errors in the report?

14           THE DEFENDANT:  Yes, I did, Your Honor.

15           THE COURT:  And is it accurate?

16           THE DEFENDANT:  Yes.

17           THE COURT:  All right.  Ms. Arco, any objections other

18   than the ones that appear to have been addressed by the final

19   PSR?

20           MS. ARCO:  That's correct, Your Honor.  I believe most

21   of our objections or clarifications have been resolved and

22   reflected in the final PSR.  I believe there had been some

23   discrepancies regarding whether Probation was affording him

24   negative 3 for acceptance of responsibility, but that also

25   appears to have been resolved.

1        THE COURT:  Okay.  All right.  So I will review the

2   guideline calculations on the record here.  I've independently

3   calculated them and believe they're correct.  But they are in

4   line with what the parties recommended in the plea agreement.

5   Correct?  Both sides agree with them?

6        MS. ARCO:  Yes, Your Honor.

7        MR. SHIPLEY:  Yes.

8        THE COURT:  Okay.  As far as the findings of fact go,

9   I will adopt the final presentence report as my findings of fact

10   under Rule 32.

11        Turning to the guideline calculations, they are on pages --

12   beginning on page 14 and continuing through page 17.  There was

13   a footnote in the government's brief regarding the fact that the

14   guidelines calculations for Count 3 were omitted from the

15   report.

16        But as I understand it, both parties agree that the proper

17   guideline for that offense, which is assaulting, resisting, or

18   impeding certain officers, was 2A2.2 and the base offense level

19   is a 14.  The official victim enhancement is 3A1.2, results in a

20   plus 6, and the obstruction, destroying documents enhancement is

21   plus 2.  So together, that's a total offense level of 22.

22        So I will add -- I'm not going to have Probation supplement

23   that report, but I note for the record I have also calculated

24   those guidelines as well, and it makes no difference in terms of

25   the guideline calculations that apply here.  As reflected in the

1    PSR, the base offense level for this offense is 14.  We have

2    enhancements, specific offense characteristics of a plus 8, and

3    that applies because it was an obstruction of the administration

4    of justice.  In addition, there's plus 3, substantial

5    interference with the administration of justice, and plus 2 for

6    the planning, as well as plus 2 for the obstruction of justice

7    after the offense.

8        All of this results in an adjusted offense level of 29, and

9    with three levels off for acceptance, we're at a level 26 and a

10   criminal history category I.

11       Everyone agrees with that?

12           MS. ARCO:  Yes, Your Honor.

13           THE COURT:  Guideline range of 63 to 78 months.

14       In addition, the government has moved for a reduction in

15   Mr. DeGrave's sentence based on his cooperation, and that is a

16   five-level; is that right, Ms. Arco?

17           MS. ARCO:  That's correct, Your Honor.

18           THE COURT:  Five-level reduction, for a guideline

19   range of 37 to 46 months; correct?  And Mr. Shipley has asked

20   for a further variance or additional reduction for Mr. DeGrave's

21   cooperation.

22       All right.  Let me go ahead and hear initially from the

23   government.  I don't -- unless you really want to play them,

24   Ms. Arco, I don't need to watch the videos again.  But if you

25   want to play a brief snippet of one or two, I will allow you to

1    do so.

2          MS. ARCO:  Sure, Your Honor.  Thank you.

3       Your Honor, first, as a matter of procedure, the government

4    referred to ten video exhibits and three paper exhibits in its

5    sentencing submission.  I understand you just referred to them

6    and have reviewed them.  We would like to formally ask that

7    those be introduced into evidence.  I understand the defense has

8    no objection.

9          THE COURT:  Any objection, Mr. Shipley?

10          MR. SHIPLEY:  No, Your Honor.

11          THE COURT:  All right.  Those exhibits are admitted.

12          MS. ARCO:  Thank you.

13       I won't repeat the entirety of our sentencing memorandum in

14    my allocution, and I will pair down the video exhibits because I

15    know you have reviewed them.

16       Our memo explains in detail why the sentencing guidelines,

17    the 3553(a) factors, and Mr. DeGrave's cooperation support the

18    government's recommended sentence.

19       What I would like to do today is to share a few videos that

20    illustrate his actions and show why the government's recommended

21    sentence, specifically 37 months of incarceration, is

22    appropriate.

23       To briefly summarize, Your Honor, Mr. DeGrave's violence

24    and aggression in aid of his goal of breaching the Capitol and

25    distinguishing himself from those who are, quote, all talk, in

his words, resulted in the successful breach of the Capitol by dozens, if not hundreds, of other rioters, as well as the breach of the Senate Chamber itself.  He assaulted numerous law enforcement officers that day to achieve his ends.

He also traveled in a car full of gear and weapons to D.C. across the country from Tennessee, ready for and seemingly eager to perpetrate violence, and that's exactly what he did on January 6.

On this point, I wanted to clarify what I found to be a bit off the mark in the defense sentencing memo.  They wrote that "DeGrave was unaware Colt had brought the firearm."  That's on page 4.  This is a bit misleading.

In his Statement of Offense, Mr. DeGrave admitted that he and his co-conspirators, quote, discussed shipping guns to Sandlin's residence in Tennessee, where they would all meet before driving to D.C.  Colt said he would try to fly with his, quote, G43, a reference to a Glock 43 pistol.  Sandlin later stated he was bringing his, quote, little pocket gun and a knife.  That's all in Mr. DeGrave's Statement of Offense, paragraph 13.

In the same paragraph, he also admitted that Colt shared a picture of his recent purchase of a Glock holster in the group chat, in the Facebook group chat.  And he further admitted to seeing Sandlin's Facebook post which depicts Mr. Colt lying in a hotel bed in Memphis, Tennessee, with a gun in his hand before

arriving in Washington, D.C.  That's in paragraph 16.

The government believes that this slight misunderstanding, misrepresentation of the facts in the defense sentencing memo stems from Mr. DeGrave's prior statement that he did not recall physically seeing the two guns brought by Mr. Colt and Mr. Sandlin during the trip, but that on the evening of January 5, Colt and Sandlin confirmed to him that they had each brought a gun with them on the trip.  That's paragraph 18 of the Statement of Offense.

I just wanted to confirm that all the context pointed to the fact that they brought their guns.  They literally told him that they brought their guns.  So it wasn't like he had no inclination that they were bringing guns to Washington, D.C.  So I wanted to make that clear.

Among what makes this case so disturbing, Your Honor, is that Mr. DeGrave was discussing with Mr. Sandlin and Mr. Colt hours before anyone ever breached the Capitol the idea of storming the Capitol.  So he didn't just follow the crowd, and you can't blame his actions on the mob mentality.  He didn't just follow everyone and walk into the Capitol.

In the TGI Friday's and then later at the World War II Memorial, as you have seen in Exhibit 2, Mr. DeGrave decided that breaching the barricades and storming the Capitol was a way to achieve his end of stopping the steal, even if part of the rhetoric was perhaps amplified to put on a good show for the

camera.  This fact alone sets him worlds apart from most
January 6 defendants.

I also wanted to highlight a statement by Mr. DeGrave on
January 6 that says out loud what I think most -- many January 6
defendants were thinking that day.  As he has admitted in his
Statement of Offense and as captured in one of the GoPro videos,
as he was walking away from the Capitol with Mr. Colt, it's a
very -- I didn't submit it to Your Honor.  It's just a black
screen, because the GoPro clearly had been put like in a
backpack of some sort but was still recording.  So we just hear
the audio of a conversation between Mr. Colt and Mr. DeGrave.

And Mr. DeGrave tells Mr. Colt, "In two hours, we're gonna
hear a decision.  They won't reject it if they know what's good
for them."  This statement explicitly acknowledges the intent,
his intent to intimidate and coerce our elected officials into
rejecting the results of a presidential election, risking our
entire democratic process -- system in the process.  I was
floored when I came across this evidence, Your Honor.

I was going to play Exhibit 2, the short clip of
Mr. DeGrave chatting by the World War II Memorial with the
walkie-talkie, but again, just to summarize --

THE COURT:  You can go ahead.  I don't want to totally
redo your allocution.

MS. ARCO:  No, no, it's okay.  I'll try to be brief.
Because I know you've watched it, I'll just summarize.

He's chatting with someone over the walkie-talkie and noting that people are, quote, going through the barricades. Again, this shows that Mr. DeGrave -- it shows him planning to storm the Capitol building, because Mr. Sandlin's at his side saying it's time to occupy the Capitol, they're going through the barricades, and they keep marching on.

Granted, this again was at Mr. Sandlin's urging. He clearly was the thought leader of this group. But it shows that even before he reaches Capitol grounds and sees the mob as a part of the mob mentality, that he's planning to do this.

Exhibit 3, which Your Honor has reviewed, was recovered from Mr. DeGrave's cell phone and shows Mr. Sandlin scaling some dismantled bike barricades along the perimeter of the Capitol grounds and Mr. DeGrave's commentary, "We're going in."

Exhibit 4, which you've watched, illustrates Mr. DeGrave's intent immediately before he stormed the Capitol. He viewed himself as a, quote, true patriot while lamenting the so-called armchair warriors who are all talk and not prepared to do what he eventually did to stop the steal.

We concede that some of this was for the camera. But as his private dialogue with his co-conspirators and his subsequent violent actions show, the sentiments he expressed were real and led him to commit the offenses to which he has pled guilty.

It should be noted again, at the time he made that video and stormed the Capitol, he had a large can of bear mace in his

1    pants pocket, as was submitted in the government's sentencing

2    memo itself.

3         And I will just briefly play Exhibit 4, which is a brief

4    clip.

5         (Video played.)

6         MS. ARCO:  And as Your Honor has seen from the video

7    exhibits played during Mr. Sandlin's sentencing hearing, which

8    were also submitted in advance of this hearing, Mr. DeGrave and

9    his co-conspirators then proceeded to scale the stairs under the

10   scaffolding and storm the Capitol building, just as Mr. Sandlin

11   suggested hours before anyone had actually done so.  They

12   immediately entered the Rotunda and then a lobby area just

13   inside the Rotunda Doors.

14        As the surveillance footage shows, Mr. DeGrave joined the

15   Sparta-like push against the three U.S. Capitol Police officers

16   who were guarding those doors against the mob, which resulted in

17   the breach of those doors, which were external doors, and that

18   action, Mr. DeGrave's joint action with his fellow rioters

19   allowed dozens, if not hundreds, of other rioters outside

20   banging to get in to breach those doors as well, so infinitely

21   increasing the mayhem in the Capitol building that day.

22        I'm going to play from Exhibit 6, Mr. Sandlin's footage of

23   the scene at the 1-minute mark to illustrate the chaos and

24   violence that Mr. DeGrave participated in.

25        (Video played.)

1          MS. ARCO:  Stopping at the 2-minute mark.

2          As you just witnessed, Mr. DeGrave participated in that mob

3     push, resulting in those doors being opened.  You can see the

4     stress and panic of Officer B.A., whose victim impact statement

5     you reviewed as a part of Mr. Sandlin's sentencing proceeding.

6     He's covered in sweat, and I can only imagine what was going

7     through his head.

8          You also just witnessed Officer -- oh, I'm forgetting his

9     initials, Your Honor, but it's a part of one of the statements

10    you reviewed as a part of Mr. DeGrave's submissions.  He had

11    just been pepper sprayed by somebody, from one of the rioters on

12    the outside who were pepper spraying in, and it rendered him

13    momentarily blind.  He had to feel along the wall to get to

14    safety, and that was captured as well.

15         Lest we think that Mr. DeGrave just happened to be there,

16    was a passive participant, Exhibit 8 was from Mr. DeGrave's own

17    cell phone.  It shows him recording this assault, and it's

18    short, so I will just play it through from beginning to end.

19         (Video played.)

20         MS. ARCO:  Your Honor, from there, the trio walked up

21    the nearby stairs to the Senate Gallery hallway, which is where

22    Mr. DeGrave and Mr. Sandlin assaulted additional U.S. Capitol

23    Police officers over access to the Senate Chamber.  I know

24    you've reviewed this.  I will skip over this and just summarize.

25         Mr. Colt can be heard in the video directing Mr. Sandlin

and Mr. DeGrave we've got to get to, quote, the Senate where they're meeting.  And this is actually Mr. Sandlin's footage.  So if we can hear it from Mr. Sandlin's perspective, Mr. Colt is speaking, Mr. DeGrave was right at their side and clearly heard this as well.  And again, it shows that the trio were, you know, bent on disrupting the congressional proceedings itself which they believed were underway.

And then I will show now a brief clip from Mr. Colt's GoPro, Exhibit 9, which clearly shows Mr. DeGrave pulling his mask down over his face before he begins participating in the assault on the officers by that door.

So I will begin playing Exhibit 9 from the 5:10 mark.

(Video played.)

MS. ARCO:  You just witnessed him pulling his mask down.

Stopping at 5:19 mark and continuing on.

(Video played.)

MS. ARCO:  Pausing at the 5:37 mark and skipping to the 7-minute mark where you can hear -- you'll hear Mr. DeGrave bragging about his assault on the officers guarding the doors.

(Video played.)

MS. ARCO:  Stopping at the 7:45 mark.

You just heard Mr. DeGrave bragging not just once but twice about assaulting officers and touting the fact that, quote, he didn't see my face, though.

1       Just to be clear, I don't think we can say conclusively

2   that he punched the officers, but certainly, there was a shoving

3   match.  So maybe he embellished a bit on that point.

4           THE COURT:  Ms. Arco, back to the scrum by the east

5   side of the Capitol doors, what is your sense of what

6   Mr. DeGrave did then?  Did he actually touch an officer, or he's

7   just pushing against the mob pushing the officers against the

8   doors?

9           MS. ARCO:  The latter, Your Honor.  I don't think he

10  was close enough to the three officers guarding the door to lay

11  hands on them directly, but our theory is aiding and abetting.

12  He clearly participated in the shoving and the pushing, that

13  obviously it was the force of the whole weight of those 20 or so

14  rioters that were able to assault the officers in such a way

15  that the doors behind them were forced open.

16          THE COURT:  He was fully engaged?  Mr. Colt was up on

17  the stairs?

18          MS. ARCO:  That's correct.

19      Skipping to the 9:45 mark, at which point Mr. Colt has

20  already jumped to the Senate Floor and Mr. DeGrave is egging him

21  on.  Mr. DeGrave has now possession of the GoPro camera that

22  Mr. Colt had previously been recording from, and I'll play this

23  through the end.

24      (Video played.)

25          MS. ARCO:  And you just heard Mr. DeGrave instruct

1   Mr. Colt to open the doors, those side doors of the Senate

2   Chamber Floor to let more of his fellow rioters onto the floor

3   itself.  And you can see Mr. Colt heeding those instructions and

4   opening the door.

5        And turning now to the last exhibit I'll play, from Exhibit

6   12, which is a continuation of the GoPro footage, again being

7   recorded by Mr. DeGrave at this point, and I will play it from

8   the beginning.

9        (Video played.)

10       MS. ARCO:  Stopping at the 15-second mark, you just

11   heard Mr. DeGrave and Mr. Sandlin telling Mr. Colt to keep the

12   door he had just unlatched open.  And as we know from C-SPAN

13   footage of this space, a lot of the rioters who were up on the

14   Senate Gallery start exiting and then later can be seen filing

15   through those doors that Mr. Colt opened.

16       I'm going to skip to the 1:20 mark, and you'll start to see

17   some of those rioters filling in on the Senate Floor.

18       (Video played.)

19       MS. ARCO:  Stopping at the 2-minute mark.

20       As we know from other footage, rioters did begin rifling

21   through senators' paperwork, leaving threatening notes,

22   et cetera.

23       And the last clip I will play, skipping to the 4-minute

24   mark where Mr. DeGrave makes his triumphant exit with Mr. Colt

25   after assaulting numerous officers and achieving his goal.

1    (Video played.)

2    MS. ARCO:  And stopping at the 4:50 mark.

3    Your Honor, there are a few additional points I wanted to

4    address, but I thought perhaps now -- I don't know if you would

5    like to address the accounting issue.  In light of the defense

6    response to your order for an accounting, the government did

7    want to amend its fine request.

8    THE COURT:  To what?

9    MS. ARCO:  To $23,800.

10    THE COURT:  And how are you getting there?

11    MS. ARCO:  So in any event, regardless of -- well, I

12    was expecting to see more detail in terms of what the legal fees

13    entailed.  But in any event, Mr. DeGrave appears to have paid

14    whatever those legal expenses are.  And so the government will

15    not be seeking a fine amounting to his disbursed legal expenses,

16    but we are we are seeking the rest.

17    THE COURT:  23,800?

18    MS. ARCO:  Yes, Your Honor.

19    THE COURT:  Okay.  Here's a question I have, Ms. Arco,

20    and I will ask Mr. Shipley about this.  In these cases where the

21    defendants have been told and defense attorneys but Mr. DeGrave

22    as well were told to return the release forms for financial

23    information and they don't do it, it's completely unverified

24    what his financial expenses are right now.

25    And the way the Court views this is it's his burden to show

he cannot afford to pay a fine.  And the guideline range for a
fine is $25,000 to $250,000.  Absent evidence that's
substantiated that he cannot afford to pay a fine, again, I
think the onus is on him.

I think the Court under the guidelines should impose a fine
in these cases.

MS. ARCO:  And I think that's perfectly appropriate,
Your Honor, and I'm glad you reminded me of that fact.  I
reached out to Mr. Shipley and his associate, Mr. Marshall, when
I noticed the absence of the financial verification and
statements, because I think it's relevant to Your Honor.  I
thought that perhaps more had been done in that regard.  But
that's true.

And I will note for the record that in listening to
Mr. DeGrave's jail calls while investigating this case,
Mr. DeGrave incredibly, to his credit, was working throughout
his incarceration.  He had an assistant based in the Philippines
who was able incredibly to manage his online business while he
was incarcerated.  So presumably, he was still making money,
perhaps at a reduced rate than normal, while he is outside.  But
he was working during his incarceration.  So presumably, he was
making money.  No idea what his accounts stand for.

But just from the government's perspective, our general
policy in terms of seeking fines in these matters, we generally
haven't been seeking fines unless we see the defendant trying to

1    capitalize off his crimes.

2            THE COURT:  Which he clearly has done here.

3            MS. ARCO:  Oh, 100 percent.

4            THE COURT:  In the amount of $120,000.

5            MS. ARCO:  Incredible.  I haven't seen any other

6    January 6 defendant -- again, I'm not fully -- I don't have full

7    visibility as to all January 6 defendants, but it's more than

8    I've seen.

9            THE COURT:  I'm confused about the government's

10   modification of its recommendation.  How are you getting to

11   $23,800, and why should the Court at a minimum not impose a

12   guideline fine?

13           MS. ARCO:  Understood, Your Honor.

14      So our policy, and I should have stated this more fully, we

15   generally don't seek a fine where the fundraising relates to

16   legitimate legal defense expenses.

17           THE COURT:  But putting that aside --

18           MS. ARCO:  But beyond that --

19           THE COURT:  Putting that aside, in a case where the

20   defendant has not given Probation the ability to verify their

21   funds, their net worth, then why should the Court -- why should

22   the default not be that a fine is imposed?

23           MS. ARCO:  I don't think that's the case.  I think

24   you're right.  I just hadn't thought about it prior to today in

25   those terms.  And so I don't have specific authority to amend

1    our request beyond what I have, but everything you're saying is

2    making sense, Your Honor.

3            THE COURT:  All right.

4            MS. ARCO:  And then just a few more points as to our

5    allocution, Your Honor.  I won't belabor this point, as I

6    believe our submissions, including the one under seal, address

7    it.

8        But despite Mr. DeGrave's public and appreciated

9    cooperation, we have some concerns about the sincerity of his

10   remorse.  To this day, he seems to be minimizing his conduct by

11   excusing it as some kind of performance, and he can't have it

12   both ways, Your Honor.

13       I did want to address this point further in a way that will

14   require me to discuss his debriefs.  Is it possible that we

15   could go under seal?

16           THE COURT:  We can, but before we get there, a thread

17   that came through his papers and, perhaps, Colt as well --

18   obviously, I reviewed them all yesterday.  So they get

19   conflated.  Stop me if I'm mixing them up.

20       But I think Mr. DeGrave did make the point that the need

21   for the protective gear, the need for the bear mace, et cetera,

22   was to fight Antifa.  Am I correct?  Is that him and not Colt or

23   both of them?

24           MS. ARCO:  I think they both alluded to that.

25           THE COURT:  Okay.  So this is the -- this case of all,

1    Sandlin and certainly DeGrave have the clearest evidence of

2    intent to obstruct as any other cases I've handled in terms of

3    out of the defendants' own mouths this is what we intend to do

4    in so many words.

5        How does the Court reconcile that with this Antifa

6    mitigating factor?  I guess the goal could be both, but it

7    certainly does not seem supported by his own words, that the

8    reason he had the gear and the bear spray, et cetera, were to

9    fight Antifa.  It seemed very intent on stopping the count.

10        MS. ARCO:  Agreed, Your Honor.

11        So first, the government does not dispute that the

12    co-conspirators intended to record their actions.  But what is

13    central, obviously, to the charge to which he pled guilty,

14    obstruction of an official proceeding, what he swore under oath

15    in his plea hearing and in the Statement of Offense is that he

16    had a concurrent ideological motive to disrupt the congressional

17    proceedings to stop the steal, which he believed would have

18    certified a fraudulent election.  In other words, it wasn't all

19    for show.  He believed in what he was doing.

20        Sure, the outfit and some of the rhetoric may have been a

21    bit amplified for the camera, like oh, I punched this guy five

22    times in the head.  We didn't see that.  He assaulted the

23    officer but didn't punch him five times.  So sure, some of this

24    is amplified.

25        But he engaged in violent acts towards achieving his

political objective of stopping the steal.  I don't think he can

say that his clearly unlawful trespass as a part of a mob, his

assaults, his calls for the theft of government property were

all for the camera.  Mr. DeGrave is not -- he's not stupid.

That was real.  That wasn't oh, I'm going to make this big show

for the camera in a way that inculpates me.  It was real.  He

was hyped up in the moment, yes, but that was real.

And his statement that I mentioned earlier about members of

Congress not certifying if they know what's good for them was

made to Colt in private.  They didn't even know that that was

being recorded.  That was not for the camera; that was decidedly

not for the camera.

THE COURT:  You mean the statement that you mentioned

that was in the backpack with the black screen?

MS. ARCO:  Exactly.  It shows his true intent.

They're walking away from the Capitol, talking about how great

it was.

THE COURT:  There's no GoPro on them at that point.

MS. ARCO:  No, it's in the backpack.  They had no idea

it was recording, completely in private dialogue.  They're not

going to certify if they know what's good for them because we

just terrified them by storming the Capitol and engaging in all

this chaos and violence.

So I think it's more than clear that his objectives

certainly support the elements of the charge to which he pled

guilty.  I don't think he's backing out from that right now, but certainly, it can't -- this Antifa narrative, yes, they talked about Antifa.  Yes, there's some mention in the group chat about oh, you know, self-defense this, but they tempered their bravado a bit, but certainly, there's a lot of other evidence showing that this -- their ideological motive motivated them to storm the Capitol, to disrupt the proceedings, and to engage in all this violence in support of that motive.

So I don't think that they can credibly say, and indeed I think it would controvert the plea agreement, to say that Mr. DeGrave's conduct was all for the camera.  I think that's applicable to Mr. Colt as well, which I will address this afternoon, but I just wanted to make that -- you affirmatively asked, but I did plan on making that clear for Your Honor.

THE COURT:  Okay.  I appreciate that.  So on the substantial assistance, is that all you have left?  I think I'd prefer to hear from Mr. Shipley and then let you all --

MS. ARCO:  There are a few things I would like to say under seal, but I think --

THE COURT:  Related to the cooperation?

MS. ARCO:  Related to things he said in his debriefs, yes, that I think are important for Your Honor to consider in determining his ultimate sentence.

But just two more quick points, and I will close.

Turning back to the 3553(a) factor of specific deterrence,

1    Mr. DeGrave's past, as discussed under seal and which I will

2    mention again after Mr. Shipley speaks, in his recent pretrial

3    violations, which are incredible to me given how close we are to

4    sentencing, show that he is still, after 17 months in custody,

5    willing to break the rules and defy authority.

6         So I think, if anything, he's showing us that specific

7    deterrence still is in order.

8         THE COURT:  Honestly, Ms. Arco, I was shocked that the

9    government made the motion to release Mr. DeGrave from prison at

10   the time he entered his plea.  It isn't really clear to me, even

11   after reviewing your cooperation motion, why that was a

12   necessary step or a wise one.

13        MS. ARCO:  I understand, Your Honor, and trust me,

14   that was heavily debated in our office.  I think there were

15   multiple considerations at play.  And in particular, as a

16   cooperator -- certainly, the marshals could have transferred him

17   to another facility, et cetera, but there was the safety element

18   of him remaining as a public cooperator.

19        THE COURT:  But that's true almost every time someone

20   agrees to cooperate.  Anyway, at the time I felt -- had some

21   trepidation, and it's borne out.  We'll get into this more in

22   the sealed proceeding, but that really was not either necessary

23   or a wise decision in retrospect.

24        MS. ARCO:  Understood, Your Honor.

25        So I will step down, but again, we believe that the filings

1    and exhibits amply show why our requested sentence of 37 months,

2    provided that you grant the 5K motion, the $23,800 fine, the

3    agreed to $2,000 in restitution, and three years of supervised

4    release is supported by the 3553(a) factors and is sufficient

5    but not greater than necessary to achieve the goals of

6    sentencing.

7         THE COURT:  Okay.  And back to your recommended fine

8    of $23,800, I take it you looked at the presentence report and

9    at the specific information he provided that's not verified and

10   tried to calculate what you thought was a reasonable fine that

11   he could afford to pay?

12        MS. ARCO:  Your Honor, it was -- to be honest, it was

13   purely based on the accounting, so just what he has fundraised.

14   That was not related to presumably legitimate legal expenses.

15        THE COURT:  Oh, so you subtract like the travel here

16   for sentencing and that kind of thing?  Is that what you mean?

17   I don't think that much was left over.

18        MS. ARCO:  It was just he disbursed legal fees to his

19   counsel, and then we sought everything else that he has fund-

20   raised.  So I specifically do not think that the

21   taxpayer should -- he should be able to expense his court-

22   related travel.  He made a disbursement to his attorney, but he

23   found the funds to get to Washington, D.C., to commit these

24   crimes.  As Judge McFadden has held in other cases, he can find

25   the means to come back here for his sentencing hearing.  So I

1    don't think he should be able to expense even court-related

2    expenses.

3              THE COURT:  Understood.  So that's just the delta

4    between the attorney fees and the 120?

5              MS. ARCO:  Yes, ma'am.

6              THE COURT:  All right.

7              MS. ARCO:  Thank you.

8              THE COURT:  Mr. Shipley, I will hear from you, and

9    then we will go under seal, and I will give Mr. DeGrave

10   afterwards an opportunity to speak.

11             MR. SHIPLEY:  Thank you, Your Honor.

12        About 30 years ago, my mentor, for lack of a better

13   description, was a Superior Court judge in Fresno County, later

14   went on to the Fifth Circuit Court of Appeals in California.  He

15   was retiring, and I asked him, Nick, why are you retiring?  He

16   looked at me and said, Bill, I've spent 25 years listening to

17   the difference between misdemeanor stupidity and felony

18   stupidity, and I'm just tired of it.  He essentially had

19   characterized most criminal activity that he had confronted as

20   both trial judge and appellate judge in two categories, and it

21   was all just stupidity.

22        Now, I don't know that that necessarily is a fair

23   representation of all criminal activity, but I think it's a fair

24   representation of much criminal activity on January 6.  It was

25   just idiotic.  The motivations that brought people there, the

1    decisionmaking they engaged in while they were there, lack of

2    maturity they demonstrated in the decisions and options they

3    chose, and the manner they conducted themselves, you know,

4    essentially videotaping their own crimes.

5             THE COURT:  I agree with you, Mr. Shipley.  A lot of

6    what Mr. DeGrave and his co-defendants did was idiotic.  But on

7    top of that, it was also extremely reckless and life-

8    threatening, particularly to those officers who were jammed up

9    between the east doors of the Capitol and the mob on both sides.

10   That video is terrifying to watch, and that is a lot more than

11   idiotic.  That is putting law enforcement officers' lives at

12   stake who were there to defend the Capitol and those inside.  It

13   minimizes the nature of what happened on that day to describe it

14   all as idiotic.

15            MR. SHIPLEY:  Your Honor, if I was suggesting to the

16   Court something that the Court wasn't already aware of, then

17   that might be true.  But the Court's seen all those videos.

18   I've seen all those videos.

19        I sat through two Oath Keepers trials, which had a lot to

20   do with the Columbus Doors and how those doors were forced open

21   by the crowd on the inside to allow access by the crowd on the

22   outside.  And at one point on the outside, there were only two

23   officers, Officer Mark Carrion and a second officer whose name

24   will come to me.  They were the only two on the outside.

25            THE COURT:  But what's the point about how idiotic it

 1    was?  Idiotic decisions bring consequences.

 2            MR. SHIPLEY:  No question.

 3            THE COURT:  What's the point that you're making

 4    about --

 5            MR. SHIPLEY:  Well, he's sitting here, you know, now a

 6    convicted felon facing sentencing for two serious felony

 7    offenses under Title 18.  He admitted to attempting -- not

 8    attempting.  He admitted to corruptly obstructing an official

 9    proceeding.  I'm not suggesting this is a misdemeanor stupidity.

10    It's clearly a felony stupidity.

11        But I also think and sometimes in my own experiences I

12    think there's a little bit of a lack or a loss of perspective

13    with regard to the thought process of different people who came

14    on January 6.  And I think Judge McFadden crystallized it for me

15    in a verdict, and I captured this in my statement.  A lot of

16    people came just to be part of an event and to watch; others

17    came to be more active and more problematic; and some came just

18    to commit violence and to cause trouble.

19        I don't think Mr. DeGrave and Mr. Sandlin and Mr. Colt came

20    to commit violence and cause trouble, but that's what they

21    decided to do after they were there.  They engaged in a series

22    of idiotic decisionmaking that brought them to the front of the

23    crowd, into the building, and then attempting to gain access for

24    others by pushing doors open.

25            THE COURT:  You don't think all of the statements and

the planning they did in advance showed an intent to be willing to engage in violence?

MR. SHIPLEY:  I don't think so, because the violence would have had to be targeted at either Congress or the police officers.  And that just became the people that were in front of them, you know, the items they wore.

And I think the government will acknowledge this, because there was -- Mr. DeGrave tried to explain something during the cooperation the government didn't initially believe but I think came around to believe.  At first, they thought that Vice President Pence had done what they expected, which was to refuse to allow the votes to be counted, and they were expecting Antifa or other counter-protestors to react violently to that.  That's what they expected to happen, was that Vice President Pence would do what the crowd wanted him to do and that the violence would be visited upon the crowd by outsiders reacting to that decision.

Now, that's not what happened.  Vice President Pence issued the statement shortly before the proceeding and said that he believed he had no authority to stop the vote count and would not do so.

Mr. DeGrave thought Vice President Pence had actually done what the crowd wanted him to do, not the opposite.

THE COURT:  So what was he doing storming the Capitol?

MR. SHIPLEY:  Because other people are going inside.

1   When they make the point to go inside, people are already

2   inside.

3           THE COURT:  Well, why are they saying after the fact

4   "we did it, we did it," not Pence did it, "we did it"?

5           MR. SHIPLEY:  Well, they made history.  You hear him

6   say in the video, "We made history, dude.  You jumped down onto

7   the floor," talking to Colt.

8       They've captured all of this on video.  They captured their

9   own idiotic thoughts on video starting hours before.  And now

10  they're going to go back and monetize this.

11      That was the life, as I pointed out in the sentencing memo,

12  that Mr. DeGrave had led for nearly a decade up to this, was to

13  make himself famous.

14          THE COURT:  But why isn't that -- the monetizing, why

15  isn't that an aggravating factor, to engage in violence, to

16  assault officers, and then try to monetize that?  Why is that a

17  mitigating factor?  Just because it's so stupid or --

18          MR. SHIPLEY:  Well, yeah, because it's -- because the

19  monetizing factor is driving the decisionmaking, not to go there

20  for the purposes of causing trouble or engaging in violence.

21  That becomes a byproduct of the decisionmaking at the moment in

22  time where they're at, which is after they gain entrance to the

23  Capitol.

24      There's no violence getting into the Capitol.  They follow

25  the breach that had taken place by others earlier.  They walked

through open doors after others have breached the Capitol and

hundreds are already inside.  They simply became a part of that.

THE COURT:  All right.  As I said to Ms. Arco, I don't

have any case where the evidence of intent to obstruct is as

clear as it is in this case.

MR. SHIPLEY:  And he pled guilty.

THE COURT:  And his Statement of Offense says he had

the intent.  He's admitted that at the time of his plea.

MR. SHIPLEY:  I don't disagree.  But it was all for

the purpose of creating content.

THE COURT:  Again, that to me is an aggravating

factor.  You're going to interfere with the certification of the

election results, number 1, crime number 1, and then you're

going to monetize that to become wealthy and famous.  That to me

is not a mitigating factor here.

MR. SHIPLEY:  I understand that, but that would apply

to all three of them.  And I think the Court reflected that in

the decisionmaking with regard to Mr. Sandlin, not just that

that was his motivation but also he's clearly introducing and

carrying the thought process for the other two, as reflected in

the videos.  He's talking for eight, nine, ten minutes, and then

he turns the camera to the others for 20 seconds, and then he

turns it back to himself.

That is the exact same dynamic that existed between the

three of them when they were talking.  It was Mr. Sandlin going

on and on and on and on, and the others would simply chime in at times.

So this is like a three-ring circus that the three of them are orchestrating.  And the entry into the Capitol was simply another place to record themselves.  And I don't disagree with the Court that it's idiotic that they would do it for that purpose, but that's the truth.

And in fact, I think the government doubted that.  The government doubted that was the purpose.  The government actually believed the purpose was more political.  And over time and through sessions, I think the government actually came along to think these really were just three clowns doing idiotic things, because they are recording their own crime spree, so to speak, from step to step to step.

It's just -- it's inexplicable otherwise that they would find it so important to not only capture video of themselves but to have a running audio of what they're doing all along.  For what other purpose would somebody be doing that?

And it goes to -- well, if you look at the lives they led in advance of January 6, it makes perfect sense.  The lives they led in advance before January 6 became an opportunity.  It was all about monetizing their presence on social media.

Mr. DeGrave at one point had 100,000 followers on Instagram for his business, which was selling health supplements.  The more attention he could draw to himself -- that's the stories

about going to events in Las Vegas and getting himself on video
with famous people, was all about attracting followers.  This
was just another opportunity.

THE COURT:  Again, Mr. Shipley, this whole argument to
me is an aggravating factor, not a mitigating.  If his whole
motivation was just to make himself more money and that's why he
was assaulting the officers rather than an honest belief that
the election was stolen and he's been manipulated, to me, the
former is more aggravated.  It's just a greedy, you're going to
put the lives of law enforcement officers and others at risk in
order to make a lot of money.

MR. SHIPLEY:  I'm not saying that was the only
motivation.  He clearly acknowledges, he was a follower and
supporter of former President Trump.  No question about it.
They talk about concerns about the election all through their
videos and the Facebook postings leading up.  It was the reason
they made the trip.

But the event at the end of the trip was an event that
could be captured.  Going into the Capitol became an opportunity
at the moment, not something that was planned in advance.  The
trip was planned in advance.  The rally was planned in advance,
all of that.  Their presence there was their opportunity.
Things unfolded in ways as they developed that day, and they
just kept the cameras rolling, and they kept talking, and they
kept filming.  I'm just giving the Court what I think is context

1    for their commentary and their conduct.

2              THE COURT:  So they didn't express ahead of time an

3    intent to stop the certification?  I thought they did.

4              MR. SHIPLEY:  No, I think they expected Vice President

5    Pence would stop the certification.

6              THE COURT:  But that they would be involved in some

7    way.

8              MR. SHIPLEY:  Supporting Vice President Pence's

9    decision.  Now -- and we can all sit back in retrospect, in

10   hindsight and say that was nonsense.  But Congress passed the

11   Electoral Vote Act which created the process, likely in

12   violation of the Twelfth Amendment, allowing for the objecting

13   to electoral count votes.

14        The people that sat back and watched that process were

15   entitled to have a political expectation that it would go one

16   way or another, because that process exists, and it's in a

17   statute.  And I don't think the statute is consistent with the

18   Twelfth Amendment, but that's a different question.

19        So the observers had the right to be either -- to either

20   applaud what happened or to condemn or criticize what happened.

21   They didn't have the right to go in the building.  They didn't

22   have the right to try to change Congress's mind by force or

23   violence.  But they certainly had the right to have a rooting

24   interest in the process going one way or going another way,

25   because that process was set forth in the statute.

1          So they can talk about it in advance.  They can express a

2   desire to have one outcome or another in advance.  And none of

3   that should be condemned, because that's all a part of the First

4   Amendment process.

5          So -- but it's clearly when they cross the line, which

6   again Mr. DeGrave didn't realize, and he told the government,

7   the government didn't believe but then later came around to

8   believing, yeah, I think they did.  They thought Vice President

9   Pence had done what they wanted him to do, and in fact, going to

10  the Capitol was more of a celebration until the opportunity to

11  go inside actually developed.  It was like well, let's go

12  inside.

13         Then over time, they realized that Vice President Pence had

14  not done --

15              THE COURT:  How can you reconcile that narrative with

16  the video I remember watching multiple times in the TGI

17  Friday's?  Aren't they saying then we're going to go storm, it's

18  time for blood, people are going to die?

19         This is not spur of the moment, we're standing outside the

20  Capitol and people are rushing in.  This is, let's get out of

21  this restaurant to go to the Capitol so we can be a part of the

22  storming of the Capitol and have blood on our hands like true

23  patriots.

24              MR. SHIPLEY:  But if you watch the video, there's

25  references to and talking about bricks being laid out in various

parts of the city and around the Capitol and the expectation

that the bricks were put in place for Antifa or other counter-

protestors, and that was the expectation of what was going to

happen at the Capitol, was that there would be a clash between

the two sides because bricks were already in place, which is

something that mythologized or factual, whatever it might be, in

the protests of the summer of 2020 and into the fall of 2020,

there were episodes where it was claimed that bricks were

strategically located in cities where riots had taken place.

In fact, you have Mr. DeGrave picking up his phone and

showing the others look, here's the pictures of the bricks.

Now, they're bricks outside a construction yard.  So who's to

say.

But they are talking about that at the TGI Friday's, the

need to go to the Capitol because violence might take place, but

it's not a contemplation of violence against the Congress or

against the police.  It's an expectation that there might be

violent clashes at the Capitol.

And we can't forget, there were violent clashes on November

14th.  There were violent clashes on December 12th.  In both

instances, it was supporters of President Trump clashing with

counter-protestors in the streets.

THE COURT:  But at some point -- even accepting your

theory as true, and I'm not sure the evidence supports it, but

even if I were to accept that, at some point it becomes quite

1    clear the other side are the law enforcement officers in the

2    Capitol building, in and around the Capitol building.

3                MR. SHIPLEY:  And they deserve every fault for their

4    decisionmaking when that became the reality in front of them.

5    And that's why he pled guilty to assault and he pled guilty to

6    obstruction, because once they're at the Capitol building and

7    once they're inside, you're absolutely right, there's no

8    counter-protestors.  That's not who the conflict exists between

9    at that point in time.

10               THE COURT:  And taking the law into your own hands and

11   fighting protestors is not legal either.

12               MR. SHIPLEY:  I'm sorry?

13               THE COURT:  Fighting against Antifa on your own also

14   is not legal.

15               MR. SHIPLEY:  Correct.  But it's a completely

16   different crime than obstructing or interfering with the

17   operations of government.

18        This town is famous for having clashes between protestors

19   at various locations around the city.  The Metropolitan PD may

20   be the best in the world at trying to keep opposing factions

21   apart from each other.  They train on that constantly.  There's

22   been testimony in this courthouse about that.  So that's not --

23   this town is not a stranger to that, never has been.

24               THE COURT:  Either way, there's an intent to violate

25   the law that's planned well in advance.

1          MR. SHIPLEY:  Oh, I don't disagree, there's an intent

2    to come here to be a part of an event that might involve

3    illegality.  They didn't travel across country with motorcycle

4    equipment and bear spray and Mr. Colt and Mr. Sandlin bringing

5    firearms with them -- and the point I raise in the motion was

6    Mr. DeGrave told the government that he didn't realize that they

7    actually had firearms until they got to D.C., and that goes

8    along with the story of him being at the wrong airport after

9    flying overnight and then having to wait.

10         He sleeps in the car the entire way to Washington, D.C.,

11   from Memphis -- or no, from Nashville where they get him.  11 or

12   12 hours to Washington, D.C., he's asleep in the van while

13   they're riding up front.  He doesn't even know there are

14   firearms until after they arrive in Washington, D.C.

15         Yes, they discussed it.  He had a firearm which he owned

16   lawfully and didn't bring with him.  He didn't know the others

17   had actually brought them until he saw them later.

18         So that was -- I wasn't trying to mislead the Court with

19   that statement.  That was his own recollection, which he gave to

20   the government.

21         So I want to talk a little bit about, though, the process

22   for how we got here, because I think it's instructive, and I

23   think the Court should hear it, because it relates to

24   Mr. DeGrave as opposed to Mr. Sandlin as opposed to Mr. Colt.

25         You know, even the government's evidence, in many ways,

1   it's hard to distinguish between Mr. Colt and Mr. Sandlin -- I'm

2   sorry, Mr. Colt and Mr. DeGrave.  Based on what the government

3   submitted, Mr. Colt's doing much more filming of himself and

4   much more talking himself as to his own conduct and his own

5   thought processes.

6         THE COURT:  He's not assaulting officers.

7         MR. SHIPLEY:  No question about it.  But the only two

8   things in that respect that Mr. DeGrave did do, as the Court

9   pointed out, which was push against other protestors pushing

10  against the officers trying to open the Columbus Doors, which

11  open out --

12        THE COURT:  In a super dangerous situation.

13        MR. SHIPLEY:  No question.  And then the scuffle on

14  the second floor, which the video shows is far less than the

15  government had characterized in the bond proceedings.

16    And I understand the bond proceedings for Mr. DeGrave

17  didn't take place before Your Honor.  They took place before

18  Judge Friedman.  But you did Sandlin.  So you saw some of this

19  video at the time.

20    But I honestly think that had I come to the Court with a

21  well laid out, dissected analysis of this evidence, given the

22  nature of the physical confrontations between Mr. DeGrave and

23  the officers, he likely would have been released, because he

24  wasn't brutalizing the officers.  He wasn't using any weapons

25  against any officers.  He didn't injure any officers.  He

1    certainly didn't make their lives easier, but his conduct, you

2    know, kind of bordered between the assault under 111, the issue

3    that's now arisen in 111 and several cases, this question, it

4    covers such a broad scope of activity, from assault to impede to

5    obstruct to interfere.

6        There can be nonassaultive conduct that violates that

7    statute, and I think pushing against the crowd which is pushing

8    against the officers is closer to obstructing or impeding than

9    it is to actually assaulting the officers, because assault

10   requires an intent to injure.

11       And the event on the second floor is more of a pushing

12   match than any kind of striking, any blows.  So there's no real

13   intent to injure there outside the Senate Gallery Door.

14       So I think a very persuasive case could have been made to

15   release him at that time had I come to this Court and laid it

16   out.  But I was dissuaded from doing that by the government.

17   Because from the moment I came into this case in September of

18   2021, I was discussing with the government an outcome and

19   cooperation from the earliest days, September 2021 until he

20   actually pled guilty in June of 2022, ten months later.

21       And I had prepared a motion, a lengthy motion for release

22   pending trial going through all this analysis, and in

23   discussions with Ms. Arco, talking about cooperation, talking

24   about an outcome, she asked me not to file it because it would

25   make her life more complicated internally trying to work out an

1    outcome in cooperation.  So I didn't.

2        So as a result, Mr. DeGrave sat in jail for 18 months

3    before he was finally released in June of 2022 in connection

4    with his agreement.

5        Contrast that with Mr. Colt, who hasn't spent a day in

6    jail.  He was released in the District of Idaho on his

7    arraignment.

8            THE COURT:  You need to plea and cooperate

9    immediately.

10           MR. SHIPLEY:  That doesn't change the facts of what

11   somebody did.  And I've struggled with that issue with

12   cooperators in this district.  There are Oath Keepers who pled

13   guilty to seditious conspiracy that have been allowed on bond.

14           THE COURT:  Well, when someone accepts responsibility

15   immediately and is remorseful, I think there are times where the

16   government views them differently from somebody who is not able

17   to do that.

18           MR. SHIPLEY:  We were interviewing and proffering and

19   admitting conduct in September of 2021.

20           THE COURT:  All right.  But that's kind of beside the

21   point.  Here we are at sentencing.  He's served 18 months.  So

22   that's 18 months less he will have to serve now.

23           MR. SHIPLEY:  That gets us to where Mr. Colt stands

24   today, which is he's never spent a night in jail, and the

25   government's recommendation for him is going to be 18 months.

1          THE COURT:  And you're not privy to the why on that,

2     just like he's not privy to the why on the 36 months.  These are

3     sealed motions, and you can't compare apples and oranges.

4          So this doesn't really help Mr. DeGrave.  When I contrast

5     the motion filed by the government with Mr. Colt and the motion

6     with Mr. DeGrave, there's a difference that's warranted.

7          MR. SHIPLEY:  I understand.  But there's information

8     that we will get into in the sealed proceeding that the

9     government didn't give you with regard to --

10         THE COURT:  Okay.  And I'm happy to hear that.  Let's

11    stick to Mr. DeGrave rather than a comparison to Mr. Colt,

12    because you don't really know what Mr. Colt did or didn't do.

13         MR. SHIPLEY:  Okay.  Let's talk about Mr. Sandlin,

14    then, because that's not subject to a cooperation agreement.  He

15    got 63 months.  He engaged in physical conduct, physical

16    hand-to-hand assaultive conduct on an officer.  He's clearly

17    the -- I don't want to use the word "ring leader."  I already

18    used that.  But he clearly orchestrated this.  He's the center

19    of gravity between the three of them.

20         THE COURT:  And that's why the government's

21    recommendation is substantially lower for Mr. DeGrave.

22         MR. SHIPLEY:  Right.  But when we get to the plea

23    agreement for Mr. DeGrave, in effect, the government -- and I

24    knew this was coming, and I told Mr. DeGrave this was coming.

25    What was coming was going to be a plea agreement that was take

1    it or leave it, and we had to eat the enhancements because we

2    didn't have a choice.  We were already ten months into the

3    process.

4              THE COURT:  So you're saying he admitted things that

5    he didn't actually do?

6              MR. SHIPLEY:  No.  I'm saying that the government gave

7    us no choice but to eat enhancements in order to essentially

8    take away the benefit of the cooperation.  Because now we're

9    here with a recommendation --

10             THE COURT:  What enhancements do you think don't apply

11   to his conduct?

12             MR. SHIPLEY:  I think the planning was highly

13   questionable.  I mean, everybody who came to D.C. from somewhere

14   else planned to get here.

15             THE COURT:  No, you would have lost that.  Rest

16   assured.  So don't worry that that you had to eat.  I don't see

17   how bringing bear spray and everything else would mean that I

18   would not apply it.

19             MR. SHIPLEY:  Now, I will acknowledge you're the

20   authority far beyond me, but I --

21             THE COURT:  Even the silly Halloween outfit, when he

22   pulls his mask down to assault the officer?

23             MR. SHIPLEY:  Well, if you look at the videos, there's

24   other videos, you can see he's pulling the mask up because the

25   eyes are fogged.  It's a cold day.  He's sweating.  He can't

1    see.  He has to take the mask up to see, and then he pulls it

2    down when he thinks he might get hit.

3        He's not trying to hide.  It's going up and down, up and

4    down because he can't see.  It's that kind of mask with plastic

5    goggles.

6            THE COURT:  And he also doesn't want to get hit in a

7    skirmish with the police or scene or whatever it is.  He

8    intentionally pulls it down.

9        Anyway, I don't think you would have won on the planning.

10    What other enhancement?

11            MR. SHIPLEY:  Well, but on the planning, it strikes me

12    when you read the guidelines, the planning has to be planning in

13    connection with the offense conduct.

14            THE COURT:  But, Mr. Shipley, you've agreed to this.

15    You haven't objected to it.

16            MR. SHIPLEY:  Fair enough.  We're not supposed to be

17    arguing.  I understand.

18        But the point is that we get to 37 months as the

19    recommendation only because the government had ratcheted up the

20    guidelines in a way --

21            THE COURT:  I don't think they've ratcheted it up.

22            MR. SHIPLEY:  I'm sorry?

23            THE COURT:  I don't think they've ratcheted it up.

24            MR. SHIPLEY:  63 to 78 months.

25            THE COURT:  The guidelines.

1      Yes, Ms. Arco.

2          MS. ARCO:  Your Honor, I just want to note for the

3      record that we're in pseudo breach territory.  So I mean, you

4      agreed to this, and I think this is concerning.

5          THE COURT:  This is not a helpful argument to the

6      Court.  If what you're saying is he needs to withdraw his plea,

7      then we can litigate that, but I don't think it's helpful to

8      Mr. DeGrave to focus on enhancements that he's agreed to.  He

9      could have gone to trial.

10          MR. SHIPLEY:  I understand.  And what I'm talking

11      about -- the Court's not involved in the plea process,

12      obviously.  The Court doesn't involve itself and doesn't

13      necessarily need to know the mechanics of the back and forth.

14      But this came at the very end of a long period of

15      discussions, and it was placed to us in a take it or leave it

16      fashion, and we took it in good faith that when we got to the

17      cooperation provision it would be accounted for.

18          THE COURT:  Okay.  And we will go under seal and talk

19      about whether you think the cooperation wasn't substantial

20      enough.

21          MR. SHIPLEY:  And then when we get there, one of the

22      other issues that arose and the Court has already suggested that

23      it might have had a different view at the time, but the

24      imposition of the home incarceration provision after being

25      released, locking him down so to speak, again, that was an

1    insistence by the government to even consider.

2            THE COURT:  And I would have insisted on it myself,

3    Mr. Shipley.  After a plea, releasing someone from prison after

4    they've admitted guilt, it's generally not what happens,

5    particularly when you're looking at a guideline range of 63 to

6    78 months.  That was an extraordinary motion the government

7    filed on Mr. DeGrave's behalf.

8         I had, as I said, real reservations about granting that,

9    and I regret it now.

10           MR. SHIPLEY:  Ms. Arco mentioned that, and the Court

11   had a reaction.  Frankly, I only know of one thing.  I'm not

12   sure if there's something beyond simply the -- the terms he's

13   on --

14           THE COURT:  I think it's a pretty egregious violation

15   in the last ten days or two weeks, whatever it is.  I think it's

16   pretty egregious to suggest that there's a problem with a

17   battery and okay, I'm going to go outside and walk around the

18   house and then disappear and go swim in the pool with your

19   girlfriend.

20        That's very sneaky and inappropriate when you're on home

21   confinement a week away from sentencing.  It's shocking.

22           MR. SHIPLEY:  He's here right now, and the battery has

23   once again died.  He's been in contact with Pretrial Services

24   yesterday and today.

25           THE COURT:  So every time the battery dies, you're

1    allowed to go swimming when you're on home confinement?

2         MR. SHIPLEY:  Well, he's in an apartment complex, and

3    he's on the second floor, and he actually has said, I actually

4    had more outside time in DOC than I have in a second floor

5    apartment.  So he can go to the mailbox, and he can go to the

6    garbage, and that's about it.

7         THE COURT:  Mr. Shipley, this applies to anyone who is

8    on home confinement.  He's not unique.  You can be locked up in

9    a cell, or you can be locked up in your home.  Generally, people

10   prefer to be locked up in their home.

11        MR. SHIPLEY:  And I have discussed with the government

12   coming back and seeking to modified that, and they have

13   explanations which we will cover later for why we didn't do

14   that.

15        THE COURT:  Okay.  Is there anything else you can say

16   on the public record before we go under seal to talk about the

17   cooperation, which seems to be the root of your frustration with

18   the government's recommendation?

19        MR. SHIPLEY:  Yes, I'm frustrated.  I'm frustrated by

20   the path that brought us here today and looking at the numbers

21   we're looking at.

22        THE COURT:  What about the financial?  That can be on

23   the record.  Why has he not returned the consent form so that

24   Probation can do its job and verify his finances?

25        MR. SHIPLEY:  I asked him that, and he said he signed

every form he got.  I can't account for which forms he got.
Until we got here today --

THE COURT:  He got the forms, and he was reminded
about the forms when he was on the interview with you.  So
there's no excuse for oh, I forgot.  And Probation pointed out
in the PSR that they didn't have the form.

So you all were on notice well before this sentencing
hearing that he has not complied with the rules.

MR. SHIPLEY:  There's only one form that was at issue,
and that was just the consent form for credit report.

THE COURT:  Well, we don't have it.

MR. SHIPLEY:  But he has bank accounts.  The bank
account's been monitored by Probation and Pretrial Services.
He's been engaged in business online from his apartment.  His
finances are transparent.

THE COURT:  I will let Ms. Gavito address what she
could not access because he had not returned the form or forms.
I don't know if it's one or more.  But my understanding is it's
much broader than just the credit report, but I will hear from
Ms. Gavito in a moment.

MR. SHIPLEY:  Well, on that -- and I will -- if there
is credit information that he hasn't provided, then I would ask
the Court to continue the conclusion of this sentencing hearing.
I'll be back here in three weeks, and I will bring him back
again, and he will have that information, because he is not --

1          THE COURT:  I'm not going to give you three weeks to
2     do this.  This was due months ago.
3          MR. SHIPLEY:  Again, Your Honor, I apologize.
4          THE COURT:  Why can't you do it immediately?
5          MR. SHIPLEY:  I have had conversations with the
6     government about his finances for weeks, because he's been
7     operating businesses, which the government has been aware of all
8     along.  I never saw a red flag go up that the government was
9     concerned.
10         THE COURT:  He's about to file taxes.  All of this
11    should be readily accessible.  Why do you need three weeks to
12    come back with the financial form?
13         MR. SHIPLEY:  Well, I only mentioned that because I
14    will be back in three weeks and we can finish this hearing at
15    that point.
16      I can submit the paperwork within three days if the Court
17    wants to just hold its judgment.
18         THE COURT:  I will consider it, but it will be by --
19    today is Tuesday.  Yeah, I don't know.  Let me hear from
20    Probation exactly what's missing.
21      I don't understand, Mr. Shipley.  This is -- I don't know
22    if you're in other districts that have other practices.  I think
23    this is pretty uniform for Probation across the country.  But
24    you waive things by not complying with the rules.  And if you
25    don't want your clients to be fined, you need to make sure they

get the financial release forms in so the information can be
verified.

MR. SHIPLEY:  And the forms came to me, and I
forwarded them to Mr. DeGrave.

THE COURT:  Then it's on him.  Even worse.

MR. SHIPLEY:  I understand; I understand.  But we're
not trying to hide it.  He's been transparent with Pretrial
Services.  They monitor his business income.

THE COURT:  Well, what do you say in response to the
government's point that he shouldn't get, you know, travel to
the sentencing hearing off of the funds he raised?  That's not
appropriate.

MR. SHIPLEY:  The Court ordered me to give an
accounting of the fundraising, and I provided the accounting.

THE COURT:  But you're suggesting in your accounting
that there's no money left to be fined.  And that's just -- it
depends how you look at what's legitimate.

MR. SHIPLEY:  Fair enough, and I'm not -- I didn't
take the position that one was legitimate or another.  I
identified where the money had been spent.

THE COURT:  All right.  Is there anything else you
want to say on the fines before we move -- or anything else
before we move to cooperation?  I want to hear briefly from
Probation.

MR. SHIPLEY:  No, that's fine.  But I just want it to

1    be clear, Mr. DeGrave is set to go back tomorrow.  We will have

2    that information by Monday at the latest.

3            THE COURT:  I might give you until Friday, but let me

4    hear from Ms. Gavito.

5        Ms. Gavito, what were you unable to do because Mr. DeGrave

6    did not return the form or forms that he was required to and was

7    asked multiple times, I understand, to provide?  Is that

8    correct?

9            PROBATION OFFICER:  Yes, Your Honor.

10       So after the defendant pled guilty, the case is assigned to

11   us by our supervisor, which was October 3rd, 2022.  At that

12   point, our supervisor sends out an e-mail to the attorneys

13   explaining that the officer has been assigned, that we need

14   consent forms.  They explain briefly about the interview process

15   and how that's going to take place.

16       That same e-mail contains consent forms, the Probation 1

17   form, which is the interview form the defendant is questioned

18   about, and the supervisor requests that all of those forms be

19   turned in as soon as possible, preferably within 14 days, so

20   that we can establish the interview and proceed with the

21   investigation process, which at times takes approximately 30

22   days to get some of those forms back from schools, from

23   financial institutions, any other kind of place where we

24   would -- health-related events where we would get the

25   defendant's consent, and we would get those forms.  We send them

1   out, and we give the institutions time to get those documents

2   and financial statements or health reports back to us.

3       At the time that the interview was done, which was

4   January 30th, 2023, I explained to Mr. DeGrave and the attorney,

5   Mr. Marshall, who was the attorney who participated in the

6   interview, I said I'm going to need documents regarding

7   financial statements.

8       Mr. DeGrave explained that he had two bank accounts, that

9   he did not have the information right at hand.  But these forms

10  were sent to him along with the Form 1, and we requested the

11  information at that time as well.

12      When the initial draft report is released to the parties,

13  we make it a point to state that due to lack of release forms

14  the following information remains unverified, and that usually

15  will trigger either a defense attorney or the defendant to say

16  okay, yes, that was an oversight, I should have sent those, we

17  have not received them or we have not turned them in.

18      And we usually get them in some cases, but we did not get

19  them in this case.  So we were unable to run a credit report.

20  We were unable to verify bank information.  We were unable to

21  verify any gifts that the defendant may have received.  We were

22  unable to request income tax documents.  Let's see.  Any credit

23  cards which would have come up in the credit record, et cetera,

24  monthly bill statements for any payments that the defendant

25  makes such as rent, utilities.

1          THE COURT:  So basically, the whole financial

2    information that's in the PSR is unverified?

3          PROBATION OFFICER:  That's correct, Your Honor.

4          THE COURT:  And you could have, had you been given the

5    proper consent forms?

6          PROBATION OFFICER:  That is correct, Your Honor.  We

7    could have at least corroborated some of the information.

8          THE COURT:  Okay.  All right.  And the guideline range

9    is $25,000 to $250,000; correct?

10         PROBATION OFFICER:  That is correct, Your Honor.

11         THE COURT:  Okay.  Thank you, Officer Gavito.

12         PROBATION OFFICER:  Thank you.

13         THE COURT:  All right.  Now we're briefly going to

14   close the courtroom so that the Court can hear information about

15   the defendant's cooperation, which has been filed under seal,

16   and we will, I suspect, reopen the courtroom in about 15

17   minutes.

18      (The following occurred under seal.)

19

20

21

22

23

24

25


10          (End of sealed proceedings.)

11          THE COURT:  All right.  So, Mr. Shipley, is there

12   anything else you would like to state on the public record

13   relating to Mr. DeGrave's history, personal characteristics, or

14   anything more?

15          I've read, obviously, your sentencing memo, but if there's

16   anything more you would like to say.

17          MR. SHIPLEY:  Your Honor, I think the Court brings

18   this, and I appreciate the Court noting it, that the point I was

19   making when we were talking about this profit motive and fame

20   and fortune motive was the way it ties into his history and the

21   very difficult, fractured upbringing and how he developed his

22   own sense of identity and self-worth from that and launched

23   himself into this, you know, if I can become famous, then I'm

24   successful, and that was the way he defined success for him.

25          And so he looked for these opportunities, but long before

January 6, he's doing these things in Las Vegas to sort of draw
attention to himself and develop a self-worth from it.

And so yeah, the profit motive is crass, and it's, as the
Court indicates, not necessarily mitigating.  It's ugly in this
instance.  But if we see where it came from and how it
developed, it takes on a different context.

THE COURT:  And would you put in that same category
his fundraising as a, quote, political prisoner?  Is that --

MR. SHIPLEY:  He and I -- I will say, I was
representing him when he wrote that letter.  I did not know
about it.  When I got it afterwards, I said you cannot take the
position we've taken with the government, which is yes, I did
it, and then at the same time advocate on behalf of I'm a
political prisoner kind of -- which was rampant within DOC at
that time.

And from that point forward, I don't think -- and Ms. Arco
and I talked about it.  I think from that point forward, he
understood that.  There's an intellectual dishonesty there, and
he didn't continue that.  He understood you can't say one thing
while in public, for public consumption, while at the same time
saying something different to the government in an effort to try
to help yourself.

THE COURT:  What about his recent getting out from
under the electronic bracelet and going for a swim?

You say it's a small thing, but it's clearly in violation

1    of his conditions, and he knew that.

2         MR. SHIPLEY:  All I can say is what his explanation

3    was to me, and he told me immediately after it happened.  I

4    didn't have all the details, and I asked him for more of the

5    details.  He said, The bracelet had died, I had recharged it,

6    but it had to recalibrate, they had told him.  It has to kind of

7    give off a series of signals where it's at in order to establish

8    its GPS location.  So they told him go walk around for 30

9    minutes so we can begin to track where it's at.

10        And while walking around for 30 minutes, the last thing he

11   did was jump into the pool, he says 30 seconds or a minute,

12   jumped out of the pool, went back to the apartment, just the

13   last thing he did walking around during the time that he was

14   told he could go out and do this to calibrate the GPS location.

15        He had never been in the pool before.  He's been staring at

16   that pool for --

17        THE COURT:  30 seconds in the pool?  Really?  And then

18   posts it all over his Instagram?

19        MR. SHIPLEY:  I don't believe so.  He's not supposed

20   to be on Instagram.

21        THE COURT:  How did Probation get the photographs?

22   The government got it?

23        MS. ARCO:  No.  My guess is -- they appear to have

24   come from his phone, and they're remotely monitoring his phone.

25   So I think those were taken off his phone.

1          MR. SHIPLEY:  He has an Instagram account for business

2     promotion purposes.  That was a part of his conditions, because

3     that's the way he develops the following for the online

4     supplements he sells.  So for that purpose, he has that

5     Instagram account.

6          I haven't seen the photographs.  I don't know why he posted

7     them.  I don't know what the caption was.

8          THE COURT:  You didn't see them in the government's

9     exhibits?

10          MR. SHIPLEY:  Frankly, I wasn't looking for that.  I

11     had heard the story from him, but that's all I had heard.

12          THE COURT:  All right.  Okay.  Would Mr. DeGrave like

13     to address the Court?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  All right.

16          THE DEFENDANT:  Your Honor, I just want to start by

17     apologizing for what I did.  To see the videos and see the

18     photos and hear myself on the computers, I'm sickened by what I

19     did.  I'm so ashamed.

20          And I want you to know that it's not representative of who

21     I am.  I've always been a proponent of nonviolence and following

22     the law.  And I know that those actions that day are a

23     contradiction to what I've always stood for, and that's part of

24     the reason I'm so devastated by what I did.

25          It's following me everywhere, to be played in public for

people to see and to judge me on.  I take responsibility, and I deserve that.  I deserve to be judged on it.

But I hope that the Court can see the larger perspective of who I am and that it was the biggest mistake I've ever made. It's terrible.

And since I've been released, I know that maybe there's been some regret for doing that, but I've tried so hard to recoup and recover everything that I've lost, and I've spent so much time reflecting and engaging in introspection as to why I did what I did.  If I don't learn the motives behind my behavior, I'm never going to learn, and I'm never going to grow as a person.

I feel like I'm a changed person.  I know that I'll never ever do anything like that again.  I'm truly sorry.  I wish that anybody's lives I put at risk, anybody who felt threatened by me, I wish I could apologize to them.  I wish I could look them in the eye and say that I'm sorry.

THE COURT:  Mr. DeGrave, you've heard us talk a little bit about your -- whether you're fully remorseful, what you did last week with regard to your electronic bracelet and going swimming in the pool, the fact that some of your prior employment is absent from the PSR.  You didn't return the financial forms.  All of these things make the Court wonder whether you've truly accepted responsibility, are remorseful for what you did, and are prepared to live a different way moving

1    forward.

2          THE DEFENDANT:  I'm super remorseful, and I would

3    never ever not follow a rule on purpose or do anything to

4    jeopardize myself or what I've built.

5          THE COURT:  What made you think it was okay to go

6    swimming?

7          THE DEFENDANT:  I was allowed out at the time.  And I

8    know that I wasn't allowed to go swimming, but I was allowed to

9    leave.  I jumped in to cool off, and I went back in.  And I

10    wasn't swimming.  It was hot.  And it's not an excuse.  I should

11    never have jumped in the pool while I was out.  It was such an

12    idiotic thing to do.

13          THE COURT:  What about not disclosing all your prior

14    employment and giving the financial information that the Court's

15    entitled to?

16          THE DEFENDANT:  Yeah, I was never reminded, I was

17    never told that there was something that was missing, that I

18    needed to fill out any form, and if I was, I would have

19    immediately done it.

20          THE COURT:  Well, Probation has told us here that you

21    were reminded on the call with Mr. Shipley, and then you also

22    told me that you read the PSR, and the PSR says that you haven't

23    provided it.  So I have a hard time understanding that

24    statement.

25          THE DEFENDANT:  I mean, maybe the communication wasn't

clear, because again, I would never ever just fail to do

something to jeopardize myself or to upset the Court for any

reason.

All he would have to do is just send me the form now.

THE COURT:  Well, we're at sentencing.

THE DEFENDANT:  I understand, Your Honor.

THE COURT:  And the time it would take to turn around

the records now is too long.

THE DEFENDANT:  I understand.  I just want you to know

that it was not intentional, and I would never intentionally

disobey the Court or any of the regulations.  It was an honest

oversight, and I never tried to avoid filling out any paperwork

that I needed to fill out.

THE COURT:  Mr. DeGrave, you've had a lot of trauma in

your life.

THE DEFENDANT:  I've had a very --

THE COURT:  And you've had a mental health assessment,

and you don't seem receptive to treatment.

You don't think that that could be something that would be

beneficial to you?

THE DEFENDANT:  I would do anything that provided

reassurance of my changed character.  And if it involved

therapy, I would be more than happy to undergo therapy.

THE COURT:  But do you really want to do it?  Because

there are limited resources, and if you don't think that you

1   have a need to --

2        THE DEFENDANT:  I would pay for therapy.  I don't know

3   if a need, but I'm always open to improving myself and becoming

4   a better person, and if that's what it took, I would be more

5   than happy to do that.

6        THE COURT:  I'm not suggesting that by doing that you

7   won't serve the time that I intend to impose.

8        THE DEFENDANT:  Of course.  I understand.

9        THE COURT:  I want to know, for your own benefit, I

10  think we all would like to see you in a healthier place than

11  you've been.  And you had a really rough childhood.

12       THE DEFENDANT:  I've worked my entire life to try to

13  change the legacy of my family tree, and I feel like I've let

14  everybody down over this, these terrible, terrible mistakes.

15    I want nothing more than to try to prove to everybody and

16  to the country and to you that I can change and that redemption

17  is possible.

18       THE COURT:  All right.  Mr. Shipley, what's your

19  position on a mental health condition?

20    It's not that I think he has a severe mental health issue.

21  It's just there is a lot of trauma, and you've made a big point

22  about how this is impacting his decisions.  And it seems to ring

23  true, based on what he said.

24       MR. SHIPLEY:  Having been at this for three-plus

25  decades, I think something that you run across often and I think

this Court has experienced is that sometimes individuals like

Mr. DeGrave lack insight, doesn't think he needs help but

doesn't realize how that kind of assistance might provide him

help that he doesn't at this point in his life recognize he

needs.

So the first step is for him to have some insight into how

his personal history brought him to a series of decisions over

many years in his adult life that ultimately landed him in

Washington, D.C., on January 6, you know, impulsive

decisionmaking, misplaced priorities, a lack of self-worth,

defining one's success in counterproductive ways.

All of those things he lacks.  And I think having some

insight into what he lacks probably would do him great benefit.

THE COURT:  I tend to agree, if he's willing to do it.

I don't want to impose a condition that he's going to be

violating, because I will retain jurisdiction, and I don't want

to be dealing with that violation if he's not committed.

THE DEFENDANT:  Your Honor, although I was influenced

by the people I was with, I take full responsibility for my

actions, because no one told me how to act that day, and I

realize that my entire life I have been influenced by people

that I've respected and people that I looked up to, whether that

was a former president or members of my peer group.

And I do think that there could be some issues that could

be potentially resolved, which is my need for attention, my need

1    for validation, my need to impress the people that I'm with.

2    That is a problem.  Although I feel like I have worked on that,

3    I would always love the help of a professional.

4              THE COURT:  All right.  Okay.  Anything else,

5    Mr. DeGrave, you would like to say?

6              THE DEFENDANT:  Just again that I'm really sorry, and

7    I'll accept whatever punishment you deem fit, and whether that's

8    jail time or further home incarceration -- I don't know if you

9    read my letter, but I have so many -- I've hired people that

10   rely on me for their survival.  I've taken on clients.  I've

11   done so much to rebuild my life and to try to move on from this,

12   and to lose it all a second time would just be so devastating.

13             But I --

14             THE COURT:  And I neglected to mention that.  I did

15   read your letter.  Thank you for your letter.

16             THE DEFENDANT:  Of course, Your Honor.  I really meant

17   every word.

18             THE COURT:  All right.  Okay.  Anything else,

19   Mr. Shipley?

20             MR. SHIPLEY:  Nothing.

21             THE COURT:  All right.  Anything from the government?

22             MS. ARCO:  No, Your Honor.

23             THE COURT:  Is there any reason why sentence cannot be

24   imposed now?

25             MR. SHIPLEY:  Nothing for the government -- nothing

1    from the defense, Your Honor.

2            MS. ARCO:  No, Your Honor.

3            THE COURT:  All right.  We've gone on for a long time,

4    and I do have another sentencing.  I'm going to try to keep this

5    brief.

6        We've discussed a lot of the key factors that you can tell

7    the Court has focused on in determining the appropriate sentence

8    to apply here.  That, of course, starts with the guidelines,

9    which we've discussed.  The parties agree that the guideline

10    range here is 63 to 78 months.

11        In addition, the Court is required to consider the factors

12    under 3553(a), and I have done so.  I'm going to focus on the

13    most critical ones, obviously the most important being in this

14    case the nature of the offense, which we've discussed at length.

15        I've adopted the Probation Office's presentence report as

16    my findings of facts.  So to the extent that this is a cursory

17    summary, I have adopted those facts in the report, and they do

18    inform my decision.

19        In short, Mr. DeGrave, along with Mr. Sandlin and Mr. Colt,

20    engaged in extensive planning before January 6 to come to D.C.

21    They talked about -- they exchanged messages.  They did many

22    things that leads the Court to conclude that they did come to

23    D.C. prepared to engage in violence, if necessary, prepared to

24    storm the Capitol, if necessary, and that they were intent on

25    stopping the certification.

1    The statement that the government highlighted in its

2    allocution highlighted the intent most clearly, and that was a

3    statement that Mr. DeGrave didn't know was being taped at the

4    time.  I think he did view himself as a true patriot, and he

5    viewed it appropriate to engage in violence to achieve his goal.

6    He was clothed in protective gear, clothing, a mask.  Granted,

7    they were not genuine military-type gear, but nonetheless, he

8    managed to use the mask to protect himself, either his identity

9    or his physical being, when he was engaged in a toe to toe with

10    the assaults outside the Senate Door.  He also had bear mace in

11    his pocket.

12    Now, the defense has made the point that much of this was

13    for the cameras.  They were filming.  They were going to

14    monetize this event.  And that was Mr. Sandlin's idea, I think

15    all agree, but Mr. DeGrave was very much on board with that,

16    that notion.

17    And so while it is certainly true that some of this may

18    have been exaggerated for the cameras, for example the

19    allegation that he assaulted five officers outside the Senate

20    Gallery or hit them five times, I can't remember the exact

21    statement, those are certainly exaggerations.

22    There's also a theory, a narrative that he was armed with

23    bear mace and dressed the way he was in order to confront

24    Antifa.

25    As I've explained, the fact that he had multiple motives is

really not a mitigating factor for me in this case, especially given the actions Mr. DeGrave took once inside the Capitol. And there was sufficient planning in advance of this at TGI Friday's and even before that I don't put him in the category of offenders who are just caught up in the excitement of the day and rushed in and did all these things impulsively. I think there was a lot of thought that went into it, and I think that he and the other defendants were executing on what they had planned once inside the Capitol.

The most troubling scene for the Court is the one that was outside -- or inside the East Wing Door where Mr. DeGrave did not himself assault any officer, but nonetheless, he was very much an active part of the mob, the violent mob that was pushing against officers who were pinned up against the door as the mob on the other side sought to enter. That, as I said already in this hearing, was a terrifying moment. You can see it on the officers' faces. They were sweating profusely, and one of the officers was sprayed with pepper spray in the eyes as soon as the doors opened. That was a terrifying scene that Mr. DeGrave was fully engaged in. I just can't imagine the fear that those officers must have felt as they faced those rioters on both sides.

In the upstairs Senate hallway outside the Senate Chamber, Mr. DeGrave was with Mr. Sandlin as he assaulted the other officers. He also brushed against an officer, assaulted an

officer, and then bragged about it inside the Senate Chamber.

Once inside, he encouraged Mr. Colt to sit in what he thought was Speaker Pelosi's seat, and he directed him to open the door to let other rioters inside the Senate Chamber.  He also directed Colt to take laptops and other items from the Senate Floor.

And after the fact, he worked actively to destroy evidence, online posts.  He used encryption, encouraged others to use encryption to conceal the messages that they were sending back and forth as the FBI was beginning to look for individuals.  And once he was interviewed by the FBI and gave a Mirandized statement, he lied to the FBI.

Now, on the other side of the equation are many facts and circumstances relating to Mr. DeGrave's background that are truly tragic and heartbreaking.  These are outlined in detail in the defense's memo and also in the presentence report.

Mr. DeGrave was raised by an unstable father who was an alcoholic, who had severe mental health issues that ultimately claimed his life, and Mr. DeGrave was -- had to step up and take care of himself, and he was certainly traumatized by a number of events that occurred as a result of his father's struggle and his parents' separation.

I do credit what Mr. Shipley says with regard to how this has impacted Mr. DeGrave's poor choices as an adult, and I am taking that into account.

1      I'm also taking into account the cooperation that he gave

2  to the government, and I am granting the government's motion for

3  a departure under 5K1.1.  I do believe that he gave substantial

4  assistance to the government that was helpful in prosecuting

5  others, and he also attempted to provide additional cooperation

6  that ultimately proved not to be substantial.  But nonetheless,

7  his effort and his desire to be cooperative I don't question at

8  all and think he does deserve a departure.

9      Generally, in these cases, I do defer to the extent of the

10  departure, and I've looked carefully at the departure that the

11  government has recommended in this case relative to the Colt

12  case, the co-defendant in this case, and the Court does believe

13  that the distinction in the departure levels is appropriate in

14  light of the timing of Mr. Colt's cooperation, and the nature of

15  his cooperation does, in the Court's view, justify distinction

16  between the two.

17      I'm also looking at whether a fine is appropriate in this

18  case.  We've discussed that at length.  Based on the financial

19  accounting the defense has provided, I do agree with the

20  government that a fine is appropriate in this case, and the

21  guideline range in this case is $25,000 to $250,000.

22      It's possible, if the Court were privy to the financial

23  information that it should be at this stage, that the Court

24  would apply -- impose a higher fine.  It's hard to say, given

25  that Probation was not able to verify the numbers that

1    Mr. DeGrave gave them.

2         But I do think, considering all the factors under 3553(a),

3    I do believe that a guideline fine is appropriate, and I will

4    impose a $25,000 fine in this case, principally for the reasons

5    the government states on the record, but also, I do believe

6    based on the PSR that there are additional funds that

7    Mr. DeGrave could use to pay both the restitution and a fine in

8    this case.  So the Court will impose a fine as well as

9    restitution.

10        Until recently -- I think the Court today senses real

11   remorse from Mr. DeGrave.  It has been slow in coming.  He has

12   given contradictory messages to the Court along the way, even

13   after his cooperation.  But there's no question he accepted

14   responsibility, and he's entitled to a full three-level

15   reduction for his acceptance.

16        Looking at other similarly situated defendants, namely

17   Mr. Sandlin and Mr. Colt, who I will be sentencing later today,

18   Mr. Sandlin received a sentence of 63 months.  He did not have a

19   5K departure.  But considering those sentences that have been

20   imposed, as well as sentences that have been imposed in similar

21   January 6 cases, the Court does believe that the government's

22   recommendation is a fair one, and the Court will adopt it and

23   impose a 37-month sentence in this case.

24        So I will now give the formal sentence of the Court, and I

25   will give each party a chance to object before I actually impose

the sentence.

Pursuant to the Sentencing Reform Act of 1984 and in consideration of the provisions of Title 18 United States Code Section 3553, as well as the advisory sentencing guidelines, it is the judgment of the court that you, Nathaniel DeGrave, are hereby committed to the custody of the Bureau of Prisons for a term of 37 months as to Counts 1 and 3, to be served concurrently.

You are further sentenced to serve a 36-month term of supervised release as to Counts 1 and 3 to run concurrently.

In addition, you are ordered to pay a total assessment of $100, which is a total of $200, for Counts 1 and 3.

While on supervision, you shall abide by the following mandatory conditions as well as the discretionary conditions recommended by the Probation Office in Part D of the sentencing options of the presentence report.

Mr. Shipley, have you reviewed those with Mr. DeGrave?  Do I need to state them on the record here?  They are in the presentence report.

MR. SHIPLEY:  I've covered them.

THE COURT:  You've covered them?

MR. SHIPLEY:  Yes.

THE COURT:  Okay.  The mandatory conditions include not committing another federal, state, or local crime, not unlawfully possessing a controlled substance, refraining from

any unlawful use of a controlled substance, submitting to one drug test within 15 days of placement on supervision and at least two periodic drug tests thereafter, cooperating in the collection of DNA, and making restitution in the amount of $2,000 to the Architect of the Capitol, and the restitution payment shall be payable to the Clerk of Court for the U.S. District Court.

In addition, until the financial obligations are paid, and that includes the fine that I mentioned of $25,000, you must provide the Probation Office access to any requested financial information and authorize the release of any financial information. The Probation Office may share that financial information with the U.S. Attorney's Office.

I will not impose a computer search provision in this case, given the nature of this offense did not involve computers until after the fact. There were certainly some ordering of goods on the computer, but this is very different from a financial computer fraud case. So I'm not going to impose that condition.

I will impose a mental health condition, which I think will aid in Mr. DeGrave's rehabilitation.

I think I've covered restitution. It shall be paid at a rate no less than $100 each month.

The Probation Office shall release the presentence investigation report to all appropriate agencies, which includes the Probation Office in the approved district, which is Nevada.

So I will transfer supervision of this case to Nevada, the District of Nevada, but I will retain jurisdiction.

So Mr. DeGrave, if there are any alleged violations of conditions of release, those will come back to me to be dealt with here in this court.

Mr. DeGrave, I want you to understand that you do have the right to appeal your conviction to the U.S. Court of Appeals for the D.C. Circuit if you believe that your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in the proceeding that was not waived in your plea agreement.

Under some circumstances, a defendant also has a right to appeal the sentence. The defendant may waive that right as a part of the plea agreement, however, and you have entered into a plea agreement which waives some of your rights to appeal the sentence itself. Such waivers are generally enforceable, but if you believe the waiver itself is not valid, you can present that theory to the appellate court.

Also, under 28 U.S.C. Section 2255, you have the right to challenge the conviction entered or the sentence imposed to the extent permitted by that statute and your plea agreement.

Any notice of appeal must be filed within 14 days of entry of judgment or within 14 days of any appeal by the government.

If you're unable to afford the cost of appeal, you may request permission from the Court to file an appeal without cost

1    to you, and on appeal, you may also perhaps apply for court-

2    appointed counsel.

3         Are there any objections before I order that this sentence

4    be imposed?  Ms. Arco?

5              MS. ARCO:  Your Honor, I'm sorry if I spaced at the

6    moment.  I heard you say restitution.  But was it the $2,000

7    that the parties had agreed to?

8              THE COURT:  Yes.  I'm sorry if I didn't state that as

9    a part of the formal sentence.  It's $2,000 with $100 payments.

10         Anything, Mr. Shipley?  Is there a recommendation as to

11   where Mr. DeGrave serve his time?

12             MR. SHIPLEY:  Your Honor, we would ask for FCI

13   Victorville in Los Angeles.  There's no facility in Nevada.

14             THE COURT:  Okay.  Is there any objection to the

15   sentence as announced?

16             MR. SHIPLEY:  No.

17             THE COURT:  All right.  Any objection from Probation?

18             PROBATION OFFICER:  Your Honor, no objections.

19         With regard to voluntary surrender, is the Court granting

20   Mr. DeGrave to self-surrender?

21             THE COURT:  Yes.  Any objection from the government?

22             MS. ARCO:  No, Your Honor.

23             THE COURT:  I think it's appropriate.  With the

24   exception of his one recent violation, which I am confident he

25   won't do again, I think he can self-surrender.

1           PROBATION OFFICER:  Thank you, Your Honor.

2           THE COURT:  Anything else?  Oh, the motion to dismiss

3      the remaining counts?

4           MS. ARCO:  We move to dismiss the remaining counts in

5      the superseding indictment.

6           THE COURT:  All right.  Without objection, I will

7      grant that motion.

8         Anything else?

9           COURTROOM DEPUTY:  Re-entry?

10           THE COURT:  I am not imposing a re-entry hearing in

11      this case because the case will be in Nevada.

12           COURTROOM DEPUTY:  And about the potential interest

13      for the fine and the restitution?

14           THE COURT:  I'm not waiving them.

15         All right.  Anything else, Mr. Shipley?

16           MR. SHIPLEY:  Nothing for the defense.

17           THE COURT:  All right.  Thank you, all.

18         (Proceedings concluded at 12:32 p.m.)

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

            I, Sara A. Wick, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.


/s/ Sara A. Wick_____          August 14, 2023_____
SIGNATURE OF COURT REPORTER       DATE